553 A.2d 1296

Warren Lamont ANDERSON

v.

STATE of Maryland.

Craig Steven BROOKS

v.

STATE of Maryland.

Nos. 837, 870, Sept. Term, 1988.

Court of Special Appeals of Maryland.

March 2, 1989.

472

474

James C. Savage, Assigned Public Defender, Rockville, for appellant, Anderson.

Frank Salvato, Specially Assigned Law Student (Nancy L. Cook, Assigned Public Defender, on the brief, Washington, D.C., and Alan H. Murrell, Public Defender, Baltimore, on both appellants' brief), for appellants.

Audrey A. Creighton, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County of Upper Marlboro, on the brief), for appellee.

Argued before MOYLAN, WILNER and ROBERT M. BELL, JJ.

MOYLAN, Judge.

The appellants, Craig Steven Brooks and Warren Lamont Anderson, were both convicted by a Prince George's County jury, presided over by Judge Darlene G. Perry, of armed robbery and related offenses. Although they were tried together, they have taken separate appeals. Because of the mutuality of the issues, we have consolidated the appeals.

The key complaint raised by both appellants is that Judge Perry erroneously failed to suppress physical evidence taken from their persons in the course of unconstitutional searches and seizures. Notwithstanding many factual similarities, there were subtle differences between the search of Brooks and the search of Anderson. Those differences are sufficiently critical to cause us to hold the search of Brooks constitutional but the search of Anderson unconstitutional.

Because we must reverse his conviction on that issue, it is unnecessary to consider any of Anderson's remaining contentions other than his claim that the evidence was legally insufficient to permit the case to go to the jury.

Andrew Smith, the robbery victim, was standing outside his home at 505 Chillum Road at approximately 8:45 P.M. on October 18, 1987, when he was approached by two men. One of them pulled a handgun on him and the other took from him a gold bracelet, a ring, a watch, a gold rope chain, and some money. After the robbers fled the scene, Mr. Smith went into his house and his mother called the police.

At approximately the same time and in the very same neighborhood, two black males attempted to rob a young man of his bicycle. The attempted robbery was thwarted when the young man made a successful getaway on the bike. Three men had witnessed the attempted robbery and gave a report to Officer Neil Murphy at the scene. As Officer Murphy was broadcasting a lookout for the two individuals involved in the attempted robbery of the bicycle, he was himself alerted to be on the lookout for the two robbers of Mr. Smith. From the similarities in the descrip-

tions and from the unities of time and place, Officer Murphy concluded that the same two men had perpetrated both crimes.

Officer Murphy immediately proceeded to the vicinity of the Takoma Park Liquor Store, located just a few blocks away on the border between the District of Columbia and Prince George's County. He there saw both Brooks and Anderson, standing in front of the liquor store with several other people. Officer Murphy drew his gun and ordered both appellants, as well as two or three other men, first to place their hands in the air and turn around and then to lie face down on the ground. At that time, Officer Murphy was reinforced by Officer Douglas C. Epperson.

As they lay upon the ground, the constitutional fortunes of Brooks and Anderson went separate ways. We turn first to the search of Anderson's pockets, which we hold to have been unconstitutional.

The investigative activity (be it search or frisk or protective pat-down) performed on Anderson was done by Officer Epperson while other police were busy performing other duties. Of the three officers who testified at the suppression hearing, only Officer Epperson could testify in any meaningful detail as to what precisely had been done to Anderson and why. Officer Epperson advanced an exclusively "stop and frisk" rationale for his actions. He described his "pat-down" by saying, "I started from around the neck area and moved my way down to the sides where he had a sweat jacket on and put my hands in his pocket and pulled everything out, a watch and a ring."

A few minutes later, Andrew Smith was brought to the scene, and, although he could not identify Anderson, he identified the watch that had been taken from Anderson's pocket as being his brother's wristwatch which had been taken from him in the course of the robbery a few minutes earlier. The possession of that stolen watch was the heart of the case against Anderson. The sole issue before us is the Fourth Amendment legitimacy of Officer Epperson's

going into Anderson's pocket and pulling out the wristwatch.

The State argues that Officer Epperson was conducting a reasonable "stop and frisk" within the contemplation of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We will assume without deciding that there was adequate articulable suspicion to stop and question Anderson. We will further assume without deciding that there was adequate articulable suspicion to frisk Anderson for weapons. Even granted a legitimate predicate for both a stop and a frisk, however, the entry into the appellant's pocket was nonetheless unconstitutional because the frisk was excessive in scope.

Our only concern is with the scope of what was done. In *Terry,* the Supreme Court pointed out that the "manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all." 392 U.S. at 28, 88 S.Ct. at 1883. The Supreme Court went on:

> "The Fourth Amendment proceeds as much by limitations upon the scope of governmental action as by imposing preconditions upon its initiation.... The entire deterrent purpose of the rule excluding evidence seized in violation of the Fourth Amendment rests on the assumption that 'limitations upon the fruit to be gathered tend to limit the quest itself.' ... Thus, evidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation." (Citations omitted).

392 U.S. at 28–29, 88 S.Ct. at 1883–84.

■ There is under the Fourth Amendment an ever-present requirement for the police to minimize even necessary intrusions. The permitted scope of an intrusion is whatever is necessary to serve the purpose of that particular intrusion, but nothing more. Both a stop and its sometimes attendant frisk are prerogatives permitted the police upon predicates less substantial than probable cause. The

reason the Fourth Amendment permits a policeman to conduct a minimal search (a frisk) of a suspect upon such a lesser predicate is the necessity of protecting from harm the life and limb of the stopping officer. The danger is that the stoppee may be armed. Because almost all weapons—guns, knives, blackjacks, brass knuckles—are hard, palpable objects, their presence may be detected by a close pat-down of the exterior of the clothing surface. Because that is all that is necessary, that is all that is permitted.

The more intensive probe that would be necessary if the discovery and preservation of evidence were the purpose is not necessary to carry out the more limited purpose of a frisk. As the Supreme Court explained, at 392 U.S. at 29, 88 S.Ct. at 1884:

> "Suffice it to note that such a search, unlike a search without a warrant incident to a lawful arrest, is not justified by any need to prevent the disappearance or destruction of evidence of crime.... The sole justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." (Citations omitted).

The limited frisk for weapons that was held to be reasonable in the *Terry* case itself has become the model for how the police should conduct this type of limited search permitted only for this limited purpose:

> "The scope of the search in this case presents no serious problem in light of these standards. Officer McFadden patted down the outer clothing of petitioner and his two companions. He did not place his hands in their pockets or under the outer surface of their garments until he had felt weapons, and then he merely reached for and removed the guns. He never did invade Katz' person beyond the outer surfaces of his clothes, since he discovered nothing in his pat-down which might have been a weapon. Officer McFadden confined his

search strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons. He did not conduct a general exploratory search for whatever evidence of criminal activity he might find."

392 U.S. at 29–30, 88 S.Ct. at 1884.

■ Had Officer Epperson patted-down Anderson's clothing and felt the contents of the pocket from the outside, that would have been legitimate. Such, however, was not the case here. We do not even reach the possibility, suggested by the State at one point in its brief, that a wristwatch or ring might, from the outside of the clothing, have felt like a weapon, thereby justifying a further intrusion into the pocket. There was no two-step intrusion involved in this case; Officer Epperson went directly to the interior of the pocket and came forth with its contents.

■ Had there been a lawful arrest of Anderson and were we involved with a search incident to that lawful arrest, there would be, of course, no scope problem. The interior of the pockets of a lawful arrestee are fair game with no further justification needing to be shown. That is so because a warrantless search incident to lawful arrest serves a dual purpose. The first of its purposes—the safeguarding of the life and limb of the arresting officer—parallels precisely the sole purpose of the frisk—safeguarding the life and limb of the stopping officer. If that were the only purpose served by a search incident, it would suffer the same scope limitations as the frisk—that of being restricted to the pat-down of the exterior of the clothing surface.

The search incident, however, has a second purpose not shared by the frisk. It is the prevention of the destruction or concealment of any evidence of crime (not necessarily suspected by the arresting officer) at the hands of the arrestee. The service of this additional purpose broadens the scope of permitted police activity. It justifies a more intensive probing into pockets, wallets, etc. wherein vulner-

able evidence might be hidden which might not be revealed by a pat-down of the clothing surface. Thus, although the scope of a search incident will not, as a matter of logic, be more extensive in space than the scope of a frisk, it may well be more intensive. We turn, therefore, to the possibility that the intrusion into Anderson's pockets could have been justified as a search incident to lawful arrest.

Although Officer Epperson articulated only a "frisk" rationale as his motivation and although the State, in brief and oral argument, advances only that rationale by way of justification, we would not be precluded from upholding the search as a legitimate incident of lawful arrest if the necessary conditions for that exception to the warrant requirement had been satisfied. As Judge Rodowsky pointed out for the Court of Appeals in *Lee v. State*, 311 Md. 642, 669, 537 A.2d 235 (1988):

> "Nor is a search incident analysis in the matter before us precluded by Officer Baughman's belief that his legal justification for opening the gym bag was a protective search for weapons. A search incident analysis applies because Baughman had probable cause to arrest at the time he opened the bag."

The search of Anderson's pockets cannot possibly be justified as a search incident to lawful arrest. That particular exception to the warrant requirement is the oldest and most quantitatively significant of all the firmly rooted exceptions. Its existence was recognized by the Supreme Court as early as *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). *And see Marron v. United States*, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927); *Go–Bart Importing Co. v. United States*, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931); *United States v. Rabinowitz*, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). The fullest articulation of its rationale came in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

At the most fundamental level, the exception, by its very name as well as by its *Raison d'être*, is *"search incident to arrest"* and not *"arrest incident to search."* Although the

precise sequence between the incidental search and the arrest is not of critical importance, the cause-and-effect relationship is. In the routine search incident situation, the arrest will ordinarily take place first and, within a few seconds or a fraction of a minute thereafter, the search incident to that arrest will follow.

■ It has been recognized, however, that there is no rigid requirement that the arrest literally precede its search incident. It is enough that they are essentially contemporaneous. The exigencies that give rise to the search incident exception in the first place—the risk of harm to the arresting officer and the risk of destruction of readily accessible evidence—sometimes compel a departure from the formal protocol. There will be occasions when the arresting officer deems it tactically unwise to lose critical seconds or even to be momentarily distracted from his overriding necessity of "beating his opponent to the draw." Under the circumstances, it would exalt form over substance to the point of absurdity to insist that an officer clap his hand upon an arrestee's shoulder and say the operative words, "You are under arrest," before disarming and/or neutralizing a potentially dangerous target. The paradigm might yield a dead officer. It is enough, therefore, that the search closely anticipate, contemporaneously parallel, or follow shortly after the arrest of which it is an incident.[1] In all three time frames, it is still an incident of the arrest. This is the purpose of the practical requirement that a lawful arrest and its search incident need only be essentially contemporaneous.

The exigencies of the essentially combat situation that exempt the policeman from the formal rigidities of parade-

---

1. For a search to be incident to a lawful arrest, there must ultimately be, whatever the precise sequence between arrest and search incident, an actual arrest. The only exemption from the requirement that the probable cause for arrest be consummated by an actual arrest is the case where extraordinary steps have to be taken to prevent the destruction of "highly evanescent evidence." *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973).

ground sequencing do not exempt him, however, from establishing the indispensable cause-and-effect relationship between the predicate event and its incidents. Although the arrest need not literally precede its search incident, the justification for the arrest must precede both the arrest and its incident. The search incident may not "bootstrap" itself by using its results to provide its own justification. No search may justify itself on the basis of what it finds. The probable cause for arrest, therefore, must predate both the arrest and its search incident, whatever the secondary sequence between those two effects may be. Cause-and-effect in this particular manifestation becomes probable-cause-and-effect. Thus, although the attendant search need not technically be "subsequent to," it must still be "incident to" its predicate lawful arrest.

In *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), the Supreme Court upheld a search incident to arrest that briefly preceded the actual arrest. The probable cause for the arrest, however, preceded the search. The only sequence that logically matters—that the justifying cause precede the intrusive effect—was satisfied, as the Supreme Court pointed out, at 448 U.S. at 110–111, 100 S.Ct. at 2564:

"Petitioner also contends that the search of his person that uncovered the money and the knife was illegal. Like the Supreme Court of Kentucky, we have no difficulty in upholding this search as incident to petitioner's formal arrest. Once petitioner admitted ownership of the sizable quantity of drugs found in Cox's purse, *the police clearly had probable cause to place petitioner under arrest. Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa.*" (Emphasis supplied).

Using *Rawlings v. Kentucky* as its benchmark, the Court of Appeals addressed a similar sequencing problem in *Lee v. State,* 311 Md. 642, 537 A.2d 235 (1988). There, an officer

had probable cause to make an arrest. Armed with that probable cause, he conducted a search incident first and then effected the formal arrest. The Court of Appeals, at 311 Md. at 668, 537 A.2d 235, found no constitutional impediment to the search incident:

"Although the police had probable cause to arrest when Baughman hefted the bag, Baughman first opened the bag, saw the gun and then told Straughan that the gun was there before the police made custodial arrests. These events occurred instantly, one after the other. Under these circumstances the fact that the search of the interior of the bag preceded the formal arrests does not prevent analyzing the search of the bag under principles governing searches incident to a valid arrest *inasmuch as there was probable cause to support an arrest at the time of the search.*" (Emphasis supplied).

The reason that the search of Anderson's pockets cannot be justified as a search incident to his lawful arrest is not because the search technically preceded the arrest. (That same sequence, for all we can determine, may have been involved in the search of the pockets of the codefendant, Brooks, but was not of critical significance). The fatal flaw is that no probable cause existed for Anderson's arrest until the fruits of the search were examined. Until the robbery victim, Andrew Smith, came upon the scene and identified the watch that had already been taken from Anderson's pocket as the watch that had been stolen a few minutes before, there was no probable cause for Anderson's arrest.

Unlike the case with respect to Brooks, the robbery victim was completely unable to identify Anderson as one of his assailants. Unlike the case with respect to Brooks, Anderson was not wearing any of the stolen property openly upon his person. Once again, unlike the case with respect to Brooks, Anderson was not the only person at the "arrest" scene wearing a particularly described (in Brooks's case, red) sweat suit. The victim had also described a dark or gray sweat suit that had been worn by "the other"

assailant, but apparently as many as three persons at the "arrest" scene were wearing sweat suits that matched that description. Until the watch that was identified by the robbery victim came out of Anderson's pocket, there was no probable cause to arrest him. Justification for his arrest cannot be based upon what the search incident to that arrest revealed.

The State argues, as an alternative basis to support the arrests of both Brooks and Anderson, that the two men, when seen by Officer Murphy in front of the Takoma Park Liquor Store, "matched the descriptions" 1) that he had taken a few minutes earlier from the three witnesses to the bicycle theft that failed and 2) that had come over the airwaves reporting the robbery of Andrew Smith. At the time of the suppression hearing, however, Officer Murphy's notes had been lost. Officer Murphy's recollection of what those descriptions had been had understandably faded. Under the circumstances, they cannot form the basis of probable cause to arrest. Warrantless arrests, searches and seizures are presumptively invalid and the burden is cast upon the State to rebut that presumption and establish their validity. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). If, even regrettably and understandably, the State cannot do this, it has failed to carry the burden allocated to it.

Even though he could not remember the details of the descriptions, Officer Murphy testified that the appellants "matched the descriptions" that he had been given. The reason, despite the State's argument, that the suppression hearing judge cannot defer to the officer and rely upon this match-up is that it is a bare conclusion. To rely upon the officer's conclusion as to the adequacy of the match-up of descriptions would be to delegate to the officer the ultimate probable cause determination. This the Constitution forbids. The requirement that the judge make the ultimate probable cause determination means, in this con-

text, that the judge herself must assess the adequacy of the match-up.

Conceding Officer Murphy's absolute integrity when he recalled that the appellants "matched the descriptions," we have no idea what that means. The very concept of "matching descriptions" spans a broad continuum from the most detailed and punctilious of match-ups to the most vague and generalized. A match-up, for instance, consisting of "a 7-foot Asiatic male and a 5-foot, 200-pound Caucasian female; one wearing a shirt with green spangles and a missing left sleeve and the other wearing a pink evening gown; one with a long gray beard and the other with a handlebar mustache" would be a match-up that would pass anyone's standard of reasonableness. Another match-up, by contrast, consisting of no other similarity than the presence of "two black males" would be woefully inadequate in terms of the Fourth Amendment. In terms of linguistic validity, there would be a "matching of descriptions" even when the correspondence of characteristics consisted of nothing more than "two males" or, for that matter, "two persons." That is why Officer Murphy's bare conclusion, unparticularized and unscrutinized, cannot suffice for the establishment of probable cause.

The stolen wristwatch found in Anderson's pocket should have been suppressed as the product of an unreasonable search and seizure. Anderson's convictions, therefore, will have to be reversed. It only remains necessary to address his contention that the evidence was not legally sufficient to support his convictions. We do this for the guidance of the lower court in the event that the State should decide to retry Anderson and he should decide to interpose a plea of double jeopardy. However insubstantial the robbery victim's identification of Anderson may have been, the presence of the recently stolen wristwatch in Anderson's pocket was ample reason for the case to have gone to the jury. The fact that we have herein decided that the wristwatch should have been suppressed has nothing to do with the sufficiency of the evidence at a trial from which it was not

suppressed. *Lockhart v. Nelson,* 488 U.S. ——, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988).

The search of Brooks and the seizure of two items from him presents a very different case. The path to affirming the legitimacy of that search and seizure is strewn, however, with confusion. Three Prince George's County police officers testified at the suppression hearing. Officer Murphy, the first policeman upon the scene, testified that Brooks and Anderson were among three black males ordered, at gunpoint, to lie upon the ground with their hands over their heads. Officer Epperson, who arrived only moments later, was sure that no less than four black males were on the ground under restraint. Detective Lynn, who ultimately took charge of the investigation, placed the number of prostrate detainees at five. Although not critical to the analysis of the search of Brooks, that confusion reflects the general imprecision as to what happened in front of the Takoma Park Liquor Store.

No one was able to establish a reliable sequence of events. Although the detention scene was actually a few feet on the District of Columbia side of the political boundary line, it was between ten and fifteen Prince George's County officers who were first on the scene just a few minutes behind Officer Murphy. An unspecified number of District officers arrived approximately ten to fifteen minutes later. While some of the Prince George's County officers were first restraining the three to five detainees, others were conducting a sweep of the surrounding area while yet others were searching a car which was parked nearby with its motor running. At some unspecified time while all of this was going on, the robbery victim, Andrew Smith, arrived in a patrol car and identified Brooks and two items of stolen property. Also at some unspecified time, the three witnesses to the attempted bicycle theft walked up to the scene and one or more of the three identified one or more of the appellants. Out of this welter of events, we will try to cull out and establish a few pertinent facts which are necessary to our decision.

We do not know which officer reached into Brooks's pockets and pulled out their contents nor do we know when that happened. Officer Murphy testified that shortly after his initial stopping of the appellants (and at least one other), both appellants were patted-down for weapons. Officer Murphy himself conducted one of those pat-downs, upon which appellant he was not sure. Those pat-downs were apparently not the same as, but rather antecedent to, the more intensive intrusions into the pockets that produced the watch and the wad of bills, for Officer Murphy testified that his initial pat-down yielded nothing in the way of evidence. Officer Epperson directed his exclusive attention to Anderson and did not observe what was happening to Brooks. When Detective Lynn arrived, the contents of their pockets were already lying beside both men, and the robbery victim, Andrew Smith, was already upon the scene.

■ Even amidst all this confusion, several things with respect to Brooks are clear. The first is that of two items seized from him, one was not the product of any search at all. Brooks was wearing openly about his neck the gold chain that he had stolen from Andrew Smith. No policeman had touched it prior to the arrival of Andrew Smith upon the scene. Upon his arrival, Andrew Smith immediately identified Brooks as one of his assailants and the clearly visible gold chain as his stolen property. After the arrival of the District officers a few minutes later, Brooks was formally arrested and the gold chain was taken from him. That seizure was without antecedent search and without constitutional impediment.

The other item, taken from Brooks's pocket, was a wad of bills. It is also clear that the search for and seizure of that wad of bills cannot be justified under any rationale based upon a frisk for weapons. Just as with the case of Anderson, a pat-down of the exterior of the clothing surface would have been enough to satisfy the limited purpose of a frisk. Any more intensive probing into the pockets, therefore, would have been an intrusion beyond the permitted scope of a mere frisk. It goes without saying that a wad of

bills does not feel like an offensive weapon. If the wad of bills is to be deemed constitutionally admissible, therefore, it will have to be upon a search-incident rationale. Upon such a rationale, we hold that it passes constitutional muster.

■ The search of Brooks's pockets was *essentially contemporaneous* with his arrest. The precise timing of the arrest was complicated by the boundary line, but the precise timing, fortunately, makes no difference in the case of Brooks. His arrest, unlike Anderson's, was based upon independent probable cause. In the immediate wake of one armed robbery and of another attempted robbery, in which a handgun had been fired, the police took off in the direction taken by the culprits. It was only minutes later and less than two blocks away that Officer Murphy came upon the appellants on the far side of Eastern Avenue, which is the boundary line. The exigent flavor of that confrontation is best captured by the conversational thrust and parry between Officer Murphy and Brooks. Brooks greeted the officer, "You can't do a fucking thing, we're in D.C." With a spontaneous "frontier" resourcefulness, Murphy replied, "My revolver works as well in D.C. as it does in P.G. County." One of the participants at both of the crime scenes had been described as wearing a red sweat suit or jogging suit. Brooks was wearing just such a suit. The report from the robbery scene described an automobile. An automobile "matching that description" was parked within a few feet of the liquor store, unoccupied but with its motor running.

There was, at the very least, articulable suspicion to stop the appellants and hold them pending the imminent arrival of the robbery victim for identification purposes. Although the sequence may be cloudy, probable cause to arrest rapidly accumulated during that "holding pattern." Within a short time, the three witnesses to the attempted robbery of the bicyclist had arrived on the scene and identified one or both of the appellants. Within a short period of time, the

nearby car had been searched [2] and a loaded handgun was found matching the description given by Andrew Smith, the robbery victim. Within a short time, Andrew Smith had arrived and positively identified 1) Brooks as one of the robbers, 2) the gold chain around Brooks's neck as stolen property, and 3) the watch taken from Anderson's pocket as stolen property. At that point, abundant probable cause existed for the arrest of Brooks.

It was apparently these identifications made by Andrew Smith that triggered the escalation of the encounter from the status of a temporary stop, the purpose of which had been fulfilled by the arrival of Smith, to the status of a *de facto* arrest. It was at that point apparently that the appellants were handcuffed. Their further detention was simply to await the arrival of the District police for purposes of making the formal arrests.

In terms of its relationship to probable cause for arrest, the recovery of the wad of bills from Brooks's pocket differed markedly from the recovery of the stolen watch from Anderson's pocket. In the first place, the recovery of the watch from Anderson's pocket clearly preceded Andrew Smith's arrival at the scene. Upon that arrival, Smith immediately identified the watch, which was already out on the ground, as his stolen property. With respect to Brooks, on the other hand, Smith identified Brooks's person and the gold chain around his neck but nothing more. When asked if he ever saw "any money near Takoma Liquor," he responded unequivocally, "No."

In the second place, the stolen watch was the only thing on which probable cause for the arrest of Anderson could

---

2. A loaded revolver matching the description given by the robbery victim was found in the car. Brooks's fingerprints were found both in and on the car. Another of Brooks's fingerprints was found on one of the cartridges removed from the gun. Numerous papers and documents bearing Brooks's name were also found in the vehicle. The appellants were ruled without standing to challenge the automobile search when it was revealed that the car had recently been stolen in Virginia.

legitimately have been based. It cannot, therefore, have been an incident of the very arrest it justified. The wad of bills taken from Brooks, on the other hand, contributed nothing to the accumulation of probable cause for his arrest.

The wad of bills, to be sure, assumed an evidentiary significance at the trial that was not yet apparent at the "arrest" scene. The wad added up to $54. Fifty-four dollars was the exact sum taken from Andrew Smith in the robbery. The denominational configuration of the wad, moreover, matched precisely the denominational configuration of the $54 taken from Smith. None of this was known at the "arrest" scene, however, where the wad had not yet been unwadded and analyzed. Andrew Smith, indeed, had no recollection of even having seen the wad of bills at the "arrest" scene.

We hold that the search of Brooks's pocket was essentially contemporaneous with the moment when his detention ripened into a *de facto* arrest and will thereby qualify as an incident of that arrest. Unlike the case of Anderson, there was nothing by way of a reverse cause-and-effect relationship here that would disqualify this search from enjoying that incidental status. The search of Brooks's pocket in no way served to justify itself.

▊▊ Brooks's remaining two contentions will not detain us long. The first deals with Judge Perry's initial decision to grant a mutual mistrial to both appellants and her almost immediate reversal of that decision when it suddenly developed that one appellant wanted the mistrial but the other did not. At one point during an aggressive cross-examination, Officer Murphy, in frustration, asked, "Can I say something to—I understand certain things have been suppressed."[3]

_____

**3.** We can understand Officer Murphy's frustration in trying to tell his story. Defense counsel was trying to separate events that for Officer Murphy were inextricably intertwined. He was calling in his description of the two perpetrators of the attempted robbery of the bicyclist

At an immediately convened bench conference, counsel for both appellants indicated they wanted a mistrial and Judge Perry indicated she was granting the motion. Seconds later, however, Anderson's counsel conferred with his client and surprised the court with the revelation that Anderson would not join in the motion. At an immediately reconvened bench conference, Judge Perry changed her decision and announced that, under those circumstances, she was not going to allow the appellants to play "little games." In the interim, which was measurable in units of seconds, nothing had yet been done to transform the informal and tentative decision into a formal one. Nothing had been entered upon the docket. Nothing had been announced in open court. Under the circumstances, we are not going to treat every syllable uttered by the judge in a hastily convened bench conference as something chiseled in marble. To do so would have an ultimately counter-productive and inhibiting effect on the salutary thinking-aloud process among judge and counsel through which ultimate decisions are frequently reached.

Judge Perry's strong and emphatic curative instruction to the jury removed any possibility of prejudice. She stated flat-out that Officer Murphy was wrong and that nothing had been suppressed:

"I want to advise you now there has been nothing suppressed in this case. The evidence the State is going to

---

at the very moment he heard over the airwaves the description of the robbers of Andrew Smith. It was the identity of the descriptions that crossed each other on the airwaves that "tripped the switch" in his mind and triggered his further actions. Although he had been instructed not to refer to the descriptions given by the three witnesses to the attempted bicycle theft, he was finding it exceedingly difficult to answer counsel's questions about the descriptions without reference to the totality of what was to him an indivisible event. As with many non-lawyers, he failed to qualify for Thomas Reed Powell's definition of "the legal mind":

"If you can think about something which is related to something else and not think about the thing to which it is related, then you have the legal mind."

put in is what you will hear and there has been nothing suppressed."

Not daunted by the hobgoblin of consistency, Anderson reversed his field yet again and indicated that he now wanted to join Brooks in the motion for a new trial. Judge Perry had regained full command of the situation and would have none of it:

"The Court: So the record is abundantly clear, the officer began to testify and mentioned something about he realizes some things have been suppressed which, in fact, is not the case. Mr. McCarthy then indicated he wanted a mistrial which the court was inclined to grant, and Mr. Savage on behalf of Mr. Anderson as well moved for the mistrial.

At that point, the court was willing to grant the motion. However, there came a time when Mr. Anderson changed his mind and then one defendant wanted a mistrial and the other one did not want a mistrial. This court felt that it could not order a mistrial over the objection of Mr. Anderson without a finding of manifest necessity to order that mistrial.

The court now that he has changed his mind and he is asking for a mistrial—I just don't think you can keep bouncing back and forth according to the wave to see what is most beneficial and confusing to the system. I have already instructed this jury that there is, in fact, nothing suppressed which is a fact and I don't believe there is any necessity for a mistrial at this point. I think this jury can be fair. It was simply an error on the officer's part which we feel has been corrected by the instruction.

I am going to deny the motion for mistrial and go forward in this case."

On the merits of her ultimate decision, we have no hesitancy in holding that Judge Perry did not abuse her discretion. There had been no clear prejudice to Brooks, so as to call for the extraordinary remedy of a mistrial. *Russell v. State*, 69 Md.App. 554, 562, 518 A.2d 1081 (1987).

Indeed, we believe the trial judge would have come far closer to an abuse of discretion had the mistrial actually been granted. The verbal indiscretion of Officer Murphy was regrettable, to be sure, but was nothing more than one of the numerous and inevitable glitches that are endemic to the trial process. Realistically, its impact was trifling. Officer Murphy never mentioned what, if anything, had been suppressed. This is totally unlike those cases cited to us by Brooks where explicit references had been made to such taboos as prior narcotics convictions and polygraph tests.

A declaration of mistrial is an extreme form of redress that should be resorted to only under extraordinary circumstances. *Tibbs v. State,* 72 Md.App. 239, 253, 528 A.2d 510 (1987). Almost every trial will stumble a few times as it runs its course. What is required is a sure sense of the difference between a mere stumble, momentarily embarrassing, and true disaster. No game is totally free of penalties but every penalty does not merit a forfeiture of the game. Were we to credit Brooks's fears that a jury would ignore hours of concrete testimony and hallucinate over some undifferentiated reference to some unnamed something, the day would be at hand to abolish forthwith so fragile and eccentric an institution as trial by jury. Unlike Brooks, we have more confidence in the basic seaworthiness of the American jury.

Brooks does not actually attack frontally the merits of the ultimate decision but relies rather on a form of reverse *stare decisis*—the notion that Judge Perry's initial determination that a mistrial was required is somehow dispositive of the fact that it was. We are not so deferential. The initial decision to grant a mistrial is no more dispositive of the ultimate merits than is the superseding decision not to do so. Indeed, were we inclined to be deferential at all, we would less likely defer to what we sense was an initially precipitous overreaction than to what we think was a far sounder second appraisal.

Our appellate role, of course, is to defer to neither but simply to determine whether the ultimate decision was within the discretionary range. We hold that it was. In a marginal case that could go either way, moreover, we would not find an abuse of discretion simply because a judge had conditioned the granting of a mistrial on the requirement that all parties request it. Avoiding the costly separation of trials that could otherwise remain consolidated is a legitimate discretionary consideration. So too is the avoiding of a future "lack of manifest necessity" argument on the part of a defendant who had suffered a mistrial over his objection also a legitimate discretionary consideration.

Brooks's final contention is that his identification by Andrew Smith as he lay on the ground in front of the Takoma Park Liquor Store was impermissibly suggestive. He argues 1) that as Smith was being transported to the scene in a patrol car, he was exposed to radio traffic describing the appellants and 2) that the fact that the appellant was face down on the ground surrounded by at least ten armed policemen carried the suggestion that the appellant was a culprit. The circumstances of the identification here typify the very nature of the one-on-one show-up at or near a crime scene in the immediate aftermath of a crime. The reliability that is gained through the immediacy of the identification far outweighs the peripheral suggestiveness of the circumstances.

Even if we were, *arguendo*, to grant suggestiveness, however, there was nothing about the suggestiveness here that was impermissible. The radio traffic was part of necessary police work, particularly in a volatile and rapidly unfolding situation such as prevailed in this case. The police are not required to muffle the ears of a passenger in a patrol car. What is constitutionally forbidden, of course, is not all suggestiveness but only impermissible suggestiveness. Whatever happened here was permissible.

The response in force to the capture of armed and dangerous men was not only permissible but imperative. If

that was suggestive, it was quintessentially permissibly so. Andrew Smith, moreover, was far more impervious to suggestion than Brooks implies. Anderson lay on the ground ringed by armed policemen just as surely as did Brooks. Yet Andrew Smith, despite that suggestiveness, indicated that he could not identify Anderson as one of his assailants.

Even if we were to grant, for sake of argument, both suggestiveness and impermissibility, moreover, there was still no substantial likelihood of irreparable misidentification under the prevailing guidelines of *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); and *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

JUDGMENTS OF CONVICTION AFFIRMED AS TO APPELLANT BROOKS; JUDGMENTS OF CONVICTION REVERSED AS TO APPELLANT ANDERSON AND CASE REMANDED FOR NEW TRIAL; ONE–HALF OF COSTS TO BE PAID BY APPELLANT BROOKS; AND ONE–HALF OF COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.