822 A.2d 1247

**Bruce Dornell WILSON,**

v.

**STATE of Maryland.**

No. 00204, Sept. Term, 2002.

Court of Special Appeals of Maryland.

May 5, 2003.

Jeffrey M. Geller, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Shannon E. Avery, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Submitted before HOLLANDER, SALMON, JAMES R. EYLER, JJ.

SALMON, Judge.

On September 27, 2001, a Maryland State Police trooper stopped appellant, Bruce Wilson, on Route 50 in Queen Anne's County, Maryland, after observing a car he was driving exceed the speed limit and follow another car too closely. The trooper subsequently found cocaine on Wilson's person. He was arrested for possession of cocaine and possession of cocaine with the intent to distribute. Wilson was thereafter charged in the Circuit Court for Queen Anne's County with those crimes.

Wilson filed a motion to suppress the cocaine, claiming that during the stop the police violated his right to be free from unreasonable searches and seizures. The court denied the motion.

Wilson subsequently pleaded not guilty on an agreed statement of facts. The court found him guilty of possession with intent to distribute cocaine and sentenced him to fourteen years of imprisonment.

## I. *QUESTION PRESENTED*

Did the trial court err in denying appellant's motion to suppress? [1]

---

1. When reviewing the denial of a motion to suppress, we are confined to the record of the suppression hearing. *Riddick v. State*, 319 Md. 180,

## II. *EVIDENCE PRESENTED AT THE SUPPRESSION HEARING*

On September 27, 2001, Corporal Karl Klotz and Deputy Shane McKinney, both of the Queen Anne's County Sheriff's Department, and Maryland State Trooper Robert Penny, Jr. (and others) attended a meeting with the Talbot County Drug Task Force. Members of the task force told the attendees that Wilson would be driving through Queen Anne's County that day, on Route 50, and that he would be carrying a large quantity of cocaine. Task force members described the vehicle Wilson would be driving as a "red Ford Escort." After receipt of this information, the officers devised a plan to apprehend Wilson.

The plan was to position officers on Route 50 and wait for Wilson to drive by; if he were seen breaking any traffic laws, he was to be stopped immediately. As part of the plan, the officers arranged for a drug sniffing canine to be nearby in case a traffic stop was made.

The plan was put into effect, and later that day, at 6:15 p.m., Wilson was observed traveling westbound on Route 50 in Queen Anne's County, driving a red Ford Escort. The police "clocked" his vehicle's speed at 63 miles per hour. The maximum speed limit was 55 MPH at the point appellant was observed. Trooper First Class ("TFC") Penny made the stop.

TFC Penny approached Wilson's vehicle and recognized him as a former high school acquaintance. The two engaged in a brief period of "small talk," after which TFC Penny asked for

---

183, 571 A.2d 1239 (1990), *overruled on other grounds, Wengert v. State,* 364 Md. 76, 89, 771 A.2d 389 (2001); *Dixon v. State,* 133 Md.App. 654, 667, 758 A.2d 1063 (2000). We extend great deference to the fact finding of the suppression judge and accept the facts as found, unless clearly erroneous. *Riddick,* 319 Md. at 183, 571 A.2d 1239; *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990). The evidence is reviewed in the light most favorable to the prevailing party—in this case, the State. *Riddick,* 319 Md. at 183, 571 A.2d 1239. Nevertheless, we make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case. *Jones v. State,* 343 Md. 448, 457, 682 A.2d 248 (1996).

Wilson's license and registration. Wilson found the registration card to the Ford Escort but could not produce a driver's license.

The trooper asked Wilson to get out of the vehicle while he "ran" his name through the police computer. At that point, the officer intended to check to see if Wilson had a valid license and to make sure the registration card Wilson had produced was valid. Wilson's front-seat passenger was allowed to stay in the automobile.

Shortly after Wilson stepped out of the car, TFC Penny noticed Deputy McKinney and his dog arrive. The K–9 unit had been summoned by radio moments earlier. Wilson was instructed to get back into his vehicle and to turn off its engine. Wilson did as he was told.

TFC Penny backed away from Wilson's vehicle after being instructed to do so by Deputy McKinney. Movement away from the vehicle was necessary because the drug dog was in a "work mode." According to Deputy McKinney, the dog got "aggressive" when working. TFC Penny was still holding the vehicle's registration Wilson had given him when he stepped away from appellant's car.

The dog performed a perimeter scan of Wilson's vehicle, which lasted less than two minutes. During the scan, the dog "alerted" while at the passenger side of the car. The dog's alert informed his handler that the dog detected the scent of a controlled dangerous substance in the vehicle. The dog handler notified TFC Penny and Corporal Klotz of the dog's findings.

TFC Penny re-approached the vehicle and again asked Wilson to get out of the car. Corporal Klotz remained behind the vehicle and watched the front-seat passenger. As Wilson stepped out, TFC Penny noticed a bulge in Wilson's right front jacket pocket. He also noticed what appeared to him to be a brown paper bag or sandwich bag sticking out of the top of the same jacket pocket.

Wilson was then asked to walk to the back of his vehicle. Wilson did as instructed and then turned to face TFC Penny, who inquired: "Bruce, what's in your jacket[?]" Before the question was answered, TFC Penny "grabbed" the pocket and just "instantaneously" felt a "large mas[s]," which he "immediately .... knew from his [15 years] of training and experience ... was the amount and probably the type of contraband" he expected Wilson to have.[2]

After he felt the bag, TFC Penny immediately pulled it out of Wilson's pocket. The bag contained numerous smaller baggies containing cocaine. Wilson was then arrested.

On cross-examination, TFC Penny testified:

MR. KANWISHER [Defense Attorney]: So you saw that and the bulge at the same time, it wasn't just the bulge, you saw the paper bag?

TFC PENNY: Yup.

MR. KANWISHER: At that point, were you concerned for officer safety, for your safety and the other officers?

TFC PENNY: I am always concerned for my safety or the other officers there, especially with this type of stop.

MR. KANWISHER: So your intent, at that point, was to see if he was carrying any weapons or was your intent, at that point, to see what was in the bag?

TFC PENNY: My intent, at that point, was to identify the bulge. I didn't know what the bulge was. So that was why I grabbed that area. Then upon grabbing that area, it was clear to me and it felt like the contraband that I should have been looking for.

The trial judge, after finding the testimony of the officers who participated in appellant's arrest to be credible, denied Wilson's motion to suppress.

---

2. In TFC Penny's words, "I felt that mas[s] of a substance before and there was no doubt in my mind, when I grabbed that item, that it was consistent with the amount of contraband and the type of contraband that we suspected [sic] to find in this particular case."

### III. *DISCUSSION*

■ Appellant admits that the police had probable cause to stop his vehicle. He contends, however, that his detention at the point drugs were discovered violated his rights, as protected by the Fourth Amendment. More precisely, he contends that once the police ceased activities concerning the traffic stop and focused their investigative energies exclusively on his possible possession of drugs, his confinement was illegal. Appellant identified the point where the detention became illegal as the moment after the canine unit arrived, which was (approximately) at the same point appellant was ordered back into his vehicle. Wilson's argument is expressed as follows:

> While Trooper Penny was beginning to process the traffic violations, Deputy Shane McKinney arrived with his drug detecting canine Rey. At this point, Trooper Penny stopped his investigation of Mr. Wilson's license and the processing of the traffic violations to allow Deputy McKinney and Rey to scan the car for drugs. As Deputy McKinney was pursuing the drug interdiction purpose of the stop, Trooper Penny and Corporal Klotz stayed away from Mr. Wilson's car. It is this abandonment of the actions related to the traffic laws that *Whitehead* [*v. State*, 116 Md.App. 497, 503, 698 A.2d 1115 (1997),] specifically prohibited when stating "stopping a car for speeding does not confer the right to *abandon* or never begin to take action related to the traffic laws."

Wilson also argues that the holdings in *Charity v. State*, 132 Md.App. 598, 753 A.2d 556 (2000), support his position that his detention after he was ordered back into his car was unlawful.

The *Whitehead* case had its origin when Cedrick Whitehead was observed by a Maryland State trooper (who was "working a K–9 shift"), driving seventeen miles over the posted speed limit. 116 Md.App. at 498, 698 A.2d 1115. Whitehead was stopped by the trooper and asked for his license and registration. *Id.* The motorist was able to produce his registration but not his license. Id. At the trooper's request, Whitehead walked back to the trooper's cruiser. Whitehead's passenger

was allowed to remain seated. *Id.* at 498–99, 698 A.2d 1115. The K–9 officer next asked Whitehead where he was coming from and his intended destination. *Id.* at 499, 698 A.2d 1115. He then went to Whitehead's car and asked the passenger the same questions. *Id.* The answers received from the passenger conflicted with those given by Whitehead. *Id.* This discrepancy prompted the trooper to ask Whitehead if he would sign a written consent to a search of his vehicle for drugs. *Id.* Whitehead became nervous, commenced stuttering, and declined to consent. *Id.* While Whitehead was being asked to sign a consent form, the trooper received a radio report that Whitehead's driving privileges were in order, that there were no outstanding arrest warrants, and that his vehicle was not stolen. *Id.* Despite receipt of this good news, the trooper detained Whitehead while his drug dog performed a scan of Whitehead's vehicle. *Id.* The dog "alerted to the driver's door." *Id.* The interior of the car was then searched, and drugs were found. *Id.* In *Whitehead,* Judge Sonner, for this Court, said:

> We think it would be a mistake to read *Whren* [*v. U.S.*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996),] as allowing law enforcement officers to detain on the pretext of issuing a traffic citation or warning, and then deliberately engage in activities not related to the enforcement of the traffic code in order to determine whether there are sufficient indicia of some illegal activity. Stopping a car for speeding does not confer the right to *abandon or never begin* to take action related to the traffic laws. . . .

*Id.* at 506, 698 A.2d 1115 (emphasis added).

In reaching that conclusion, Judge Sonner commented about the lack of probable cause (prior to the K–9 alert) to believe that Whitehead's vehicle contained drugs.

> There is nothing that [Trooper] Donovan observed that even remotely indicates an involvement in the transportation of drugs. He did not observe scales, bongs, glassine bags, or instruments which may have a law abiding use, but about which an educated police officer could testify can also be consistent with drug dealing and, therefore, could give

rise to a permissible inference that criminal narcotic activity is afoot. Law enforcement personnel do not have the discretion to select neutral human behavior as the justification for the formation of probable cause. Wayne R. La-Fave, *Search and Seizure, A Treatise on the Fourth Amendment,* Section 3.6(f) (2d ed.1987); *People v. Reynolds,* 94 Ill.2d 160, 68 Ill.Dec. 122, 445 N.E.2d 766 (1983); *Donaldson v. State,* 46 Md.App. 521, 534, 420 A.2d 281 (1980).

*Id.* at 504–05, 698 A.2d 1115.

*Charity v. State* was preceded by our *Whitehead* decision. The facts in *Charity* were somewhat similar to those in *Whitehead* and were outlined by the Court as follows:

According to Sergeant Lewis's testimony at the suppression hearing, he approached the second vehicle, advised the appellant as to why he had been stopped, and asked to see a driver's license and registration card. After noticing that Sean White, the only passenger in the car, was not wearing a seat belt, Sergeant Lewis requested his identification as well. Both the appellant and White complied. As he stood at the window, Sergeant Lewis noticed a large bundle of air fresheners hanging from the rear view mirror. A subsequent count revealed 72 such air fresheners.

Sergeant Lewis also indicated at the suppression hearing that "there was little doubt" in his mind that there was "something criminal going on inside the vehicle." His suspicion was based on the large number of air fresheners and on the fact that the appellant had a North Carolina driver's license and White had a New York license. Based on those observations, Sergeant Lewis asked the appellant to step out and to move to the rear of the vehicle, notwithstanding that a light rain was falling. He then began questioning the appellant as to where he was coming from and where he was going.

Leaving the appellant standing in the rain, Sergeant Lewis then approached the passenger side of the vehicle and began asking White the same questions. After receiv-

ing answers from White that were different from the answers given by the appellant, Sergeant Lewis returned to the rear of the vehicle where the appellant was standing. Because it then began to "rain heavier" and because he wanted to have the appellant "seated in [his] cruiser," Sergeant Lewis requested a "consensual patdown" of the appellant. The appellant ostensibly consented.

In the course of the pat-down, Sergeant Lewis felt a bulge in the appellant's front pants pocket. In response to the sergeant's question regarding the contents of the pocket, the appellant reached into the pocket and pulled out a packet of gum and some money. In the process of the appellant's doing so, Sergeant Lewis saw "a one gram size packet" of what he "readily recognized to be marijuana" between the appellant's ring finger and his middle finger. Sergeant Lewis then "plucked" the packet from the appellant's fingers, held it in front of his face, and stated, "This authorizes me to conduct a full-blown search of your vehicle now."

132 Md.App. at 602–04, 753 A.2d 556.

Thereafter, Charity's car was searched incident to the arrest for possession of marijuana. *Id.* at 604, 753 A.2d 556. A large quantity of cocaine was found as a result of the search. *Id.* In *Charity*, we said:

In determining whether a police officer has exceeded the temporal scope of a lawful traffic stop, the focus will not be on the length of time an average traffic shop should ordinarily take nor will it be exclusively on a determination, pursuant to *Ferris*, of whether a traffic stop was literally "completed" by the return of documents or the issuance of a citation. Even a very lengthy detention may be completely reasonable under certain circumstances. Conversely, even a very brief detention may be unreasonable under other circumstances. There is no set formula for measuring in the abstract what should be the reasonable duration of a traffic stop. We must assess the reasonableness of each detention on a case-by-case basis and not by the running of the clock.

In both *Snow v. State*, [84 Md.App. 243, 578 A.2d 816 (1990),] and *Munafo v. State*, [105 Md.App. 662, 660 A.2d 1068 (1995) ], we held that an initially valid traffic stop could not serve as the justifying predicate for the narcotics-related investigation that followed in its immediate wake, notwithstanding the fact that in both cases "the total length of the stop was brief and did not exceed the normal duration for a traffic stop." *Munafo* ... at 671 [660 A.2d 1068].

What might be a reasonable duration for most traffic stops might not be reasonable duration for a particular traffic stop on a particular occasion. Reasonableness may depend on whether the purpose of the traffic stop is actually being pursued with some modicum of diligence. We repeat that in processing a traffic infraction the police are not to be monitored with a stop-watch. Neither, however, does *Whren* confer on them, for example, five minutes of "free time" to do whatever they wish in the service of some other investigative purpose.

*Id.* at 617, 753 A.2d 556.

The *Charity* Court looked to *Ferris v. State*, 355 Md. 356, 735 A.2d 491 (1999), for guidance. *Ferris*, unlike *Whitehead*, did not involve a *"Whren* stop," *i.e.*, a stop ostensibly made to enforce the traffic laws but in reality a stop for another motive—such as to enforce the narcotics laws. *Charity*, 132 Md.App. at 610–11, 753 A.2d 556. Ferris was stopped simply because he was speeding. *Ferris*, 355 Md. at 362, 735 A.2d 491. After completing a license and registration check, the police officer gave Ferris a traffic citation. *Id.* Immediately thereafter the officers asked Ferris to step out of his vehicle to "answer a couple of questions." *Id.* at 363, 735 A.2d 491. The request was made because (1) the trooper had seen Ferris and his passenger "acting nervous," and (2) Ferris's eyes were bloodshot yet no odor of alcohol was detected on his breath. *Id.* Ferris was questioned, and he admitted that he and his companions had smoked a "joint" of marijuana about three hours earlier; shortly thereafter, Ferris's companion turned over some marijuana. *Id.* at 364, 735 A.2d 491. The car was then searched, and additional marijuana was found. *Id.* Fer-

ris was arrested and was later found guilty of possession of marijuana with the intent to distribute. *Id.* at 366, 735 A.2d 491. In *Ferris,* the Court held:

> In sum, the officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention. *See [Florida v. ]Royer,* 460 U.S. [491] at 500, 103 S.Ct. [1319] at 1325–26[, 75 L.Ed.2d 229 (1983) ]. Thus, once the underlying basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment is constitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is afoot. *United States v. Sandoval,* 29 F.3d 537, 540 (10th Cir.1994)).

*Id.* at 372, 735 A.2d 491.

The case *sub judice* is different from *Charity, Whitehead,* and *Ferris* in one important respect. Here, the police had cause to stop and question the motorist for two separate reasons: (1) a traffic violation was committed in the officer's presence and (2) the officer who made the stop had, at a minimum, a reasonable articulable suspicion that the motorist was transporting drugs (based on a tip from the Drug Task Force). Thus, when the police stopped, momentarily, their investigative endeavors in relation to the traffic violation, they had independent constitutional justification for detaining Wilson—based on the tip that he was transporting a large quantity of cocaine.[3]

---

**3.** The Supreme Court said in *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), that even an anonymous telephone tip from an informant, which was not independently verified, gave rise to an articulable suspicion that would justify a *Terry* stop. The Court said:

> *Reasonable suspicion is a less demanding standard than probable cause* not only in the sense that *reasonable suspicion can be estab-*

The case of *Pryor v. State*, 122 Md.App. 671, 716 A.2d 338 (1998), is instructive. A confidential informant told Detective Scott Griffin that Pryor was "selling large quantities of cocaine in the Frederick Road area of Catonsville." *Id.* at 675, 716 A.2d 338. The informant also gave Detective Griffin Pryor's address, the make and model of his car, and the fact that Pryor stored cocaine in the dashboard of his vehicle. *Id.*

Pryor was subsequently observed by Detective Griffin exceeding the posted speed limit. *Id.* The detective instructed a uniformed officer to make a traffic stop of Pryor's vehicle. *Id.* Pryor and his passenger were ordered out of the car. *Id.* The two were then forced to wait twenty to twenty-five minutes for the arrival of a narcotics dog. *Id.* at 677, 716 A.2d 338. The dog sniffed the perimeter of the defendant's vehicle and gave an alert for the presence of a controlled dangerous substance within the vehicle. *Id.* at 675, 716 A.2d 338. The dog thereafter entered the vehicle and signaled to its handler that the contraband was in the dash. *Id.* A search revealed that the dog (and the informant) were right and crack cocaine was found secreted under the car's dashboard. *Id.* at 676, 716 A.2d 338. In *Pryor*, we said that the forcible stop was justified for two reasons, *viz:* "(1) there was reasonable articulable suspicion that appellant might be in possession of contraband; and (2) an officer saw appellant violate the law." *Id.* at 680, 716 A.2d 338.

The Fourth Amendment permits the forcible stop of a motorist who is observed by a law enforcement officer to be violating a "rule of the road." The Fourth Amendment also permits the forcible stop of a vehicle when there is reasonable articulable suspicion to believe that its occupants are involved in criminal activity. In neither of these situations,

---

*lished with information that is different in quantity or content than that required to establish probable cause,* but also in the sense that *reasonable suspicion can arise from information that is less reliable than that required to show probable cause.*
(Emphasis added.)

*Alabama v. White* was recently fully discussed in *Carter v. State,* 143 Md.App. 670, 680, 795 A.2d 790 (2002).

however, may the occupants of the vehicle be detained for an extended period of time. In the absence of a justification for continued detention that manifests itself during the period of time reasonably necessary for the officer to (1) investigate the driver's sobriety and license status, (2) establish that the vehicle has not been reported stolen, and (3) issue a traffic citation, the Fourth Amendment prohibits a detention in excess of that period of time. In this case, whether the period of appellant's detention is characterized as a "first" (traffic) stop followed by a "second" (drug investigation) stop or as a single stop that was justifiable for two different reasons, appellant was detained much longer than was reasonable. The evidence derived from that unreasonable detention was acquired in violation of his Fourth Amendment rights.

*Id.* at 682, 716 A.2d 338.

The case *sub judice* is distinguishable from *Pryor* because here the canine unit arrived within "two minutes" of the stop, and it took less than two additional minutes for the dog to alert to the presence of drugs. TFC Penny could not have been expected to complete a check to see if appellant had a valid license and registration and give a speeding ticket (or warning) within four minutes.[4] As we observed in footnote 6 in *Pryor*: "If the K–9 had been present at the moment of the stop, or arrived during the period of permissible detention, its "perimeter search" of appellant's vehicle would have been entirely proper." *Id.* at 681, 716 A.2d 338. Here, two minutes

---

4. We emphasized in *Charity:*

> We are not suggesting for a moment that when the police effectuate a traffic stop, they are operating under a "time gun" or may not pursue two purposes essentially simultaneously, with each pursuit necessarily slowing down the other to some modest extent. We are simply saying that the purpose of the justifying traffic stop may not be conveniently or cynically forgotten and not taken up again until after an intervening narcotics investigation has been completed or has run a substantial course. The legitimating power of a traffic stop to justify a coincidental investigation has a finite "shelf life," even when the traffic stop, as in this case, is not formally terminated.

132 Md.App. at 614–15, 753 A.2d 556.

was clearly a "reasonable time" to wait for the arrival of the canine unit. Moreover, even if we assume, as appellant does, that what occurred after the arrival of the canine unit constituted a "second stop," that stop was entirely justified as a result of the tip from the Talbot County Narcotics Task Force. That tip, standing alone, gave TFC Penny a reasonable articulable suspicion that his car contained drugs. Thus, it was not unreasonable to hold Wilson for a short interval while the drug dog performed his duties.

 The appellant argues, in the alternative, that even if he was lawfully detained, TFC Penny's search was illegal because the search was pre-arrest, not incident to a valid arrest. Appellant's precise argument is:

> In the instant case, Trooper Penny engaged appellant for a *Terry* frisk following the positive alert by the drug dog. Trooper Penny put his hand on appellant's clothing and asked appellant "what's in your jacket?" indicating that he did not yet know what was in appellant's possession. Trooper Penny was clearly acting on a reasonable articulable suspicion to determine if there was probable cause to arrest. Trooper Penny then "grabbed both pockets" and felt what he believed to be drugs. Penny then "reached into the pocket, glanced into the bag [and] could see what appeared to [him] to be numerous bags of crack cocaine. Following this sequence of events, Trooper Penny told appellant to turn around, to put his hands behind his back, and that he was under arrest.

> By Trooper Penny's own admission, appellant was not under arrest until after the search of appellant's person and the paper bag. Appellant was not arrested up to and until the point that he was told to turn around, place his hands behind his back, and that he was under arrest. Prior to that point in time, appellant was not under arrest. To conclude otherwise would qualify all *Terry* pat-downs as arrests. Therefore, the search of appellant was pre-arrest,

without a warrant, and without any applicable exception to the warrant requirement.

(References to transcript omitted.)

■ The above argument overlooks the fact that, for the "search incident to an arrest" exception to the warrant requirement to be applicable, the search need only be "essentially contemporaneous" with the arrest. This was explained [5] in *State v. Funkhouser*, 140 Md.App. 696, 730, 782 A.2d 387 (2001), where we said:

> For a search to be an incident of an arrest, it need not literally follow the arrest. If an officer has determined to make an arrest, the search incident is simply an aspect of the arresting prerogative. It is one part of an omnibus tactical maneuver. Because of the potential exigencies of a police-citizen confrontation, the process of 1) disarming the arrestee and 2) preempting destructible evidence a) may proceed simultaneously with the act of arresting or b) may even precede it by a moment or two. This departure from more routine sequencing does not destroy the search's character as an aspect or incident of the arrest it merely supports and accompanies.

The search of appellant was preceded, as appellant admits, by a legitimate *"Terry* pat-down." When the pat-down was complete, the police had probable cause to believe that the package he carried in his pocket contained drugs. The facts that gave rise to that probable cause were (1) the contents of the tip TFC Penny received from the Talbot County Narcotics Task Force; (2) the fact that the narcotics dog had "alerted" on the car that appellant was driving (*Wilkes v. State*, 364 Md.

---

**5.** *See also Ricks v. State*, 322 Md. 183, 191 n. 2, 586 A.2d 740 (1991):

The search in this case would not have been invalid, even if Ricks was arrested after the search of the bag. As long as the search and the arrest are *essentially contemporaneous*, a search may be analyzed under the principles governing searches incident to arrest. *Lee* [*v. State*, 311 Md. 642, 537 A.2d 235 (1988)], citing *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Anderson v. State*, 78 Md.App. 471, 481–82, 553 A.2d 1296 (1989). (Emphasis added.)

554, 586, 774 A.2d 420 (2001) (drug dog's alert to the presence of drug scent generates probable cause to search the vehicle); and (3) TFC Penny's knowledge gained by what he could feel.[6]

The search of appellant occurred when TFC Penny yanked the paper bag from appellant's front shirt pocket. The testimony of TFC Penny was uncontradicted that he pulled out the bag "instantaneously" after he felt the bag's contents and that, immediately after he felt the contents, he recognized the contents of the bag as cocaine. He then arrested appellant. Therefore, the search was made "essentially contemporaneously" with appellant's arrest.

■ Appellant's last argument is that the search exceeded the permissible scope of a *"Terry* pat-down." He argues:

When Trooper Penny noticed the paper bag sticking out of appellant's jacket pocket, he told appellant to go to the back of the car. Trooper Penny "put his hand on" appellant's jacket. This action by the trooper is exactly what *Terry* envisioned—a patting of the outer clothing by an officer's hands. Most significantly, Trooper Penny next asked what was inside. This is a clear indication that the officer's pat of the outer clothing did not make it immediately apparent that there was contraband or a weapon inside. He then "grabbed" appellant's pockets and felt an object. It was only the grabbing that led the officer to the conclu-

---

6. See *Stokes v. State,* 362 Md. 407, 412 n. 6, 765 A.2d 612 (2001) (The "plain feel doctrine" is applicable when "a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent [as contraband], there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons ... [and] its warrantless seizure," is thus justified.). Here, there was no evidence that TFC Penny impermissibly manipulated or palpated the item in an effort to determine its character; rather, according to TFC Penny, he knew from his training and experience in narcotics and fifteen years on the force that the item he felt was the narcotics that he had been told Wilson would be carrying. See *Minnesota v. Dickerson,* 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *Commonwealth v. Whitmore,* 92 S.W.3d 76 (Ky.2002) (providing a useful overview of the federal plain feel cases); *United States v. Williams,* 38 Fed.Appx. 26 (D.C.Cir.2002); *United States v. Johnson,* 212 F.3d 1313 (D.C.Cir.2000).

sion that there was contraband in appellant's pocket. It is this grabbing of appellant's pockets that made the frisk unconstitutional under *Terry* [*v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),] and [*Minnesota v.*] *Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)].

(References to transcript omitted.)

The major premise of the foregoing argument is that TFC Penny "patted-down" appellant's outer garments first, then asked Wilson what was in the pocket, and then grabbed for the pocket. But a review of TFC Penny's testimony provides no support for appellant's premise. TFC Penny testified:

> I instantaneously went to put my hand on his jacket and I said, Bruce, what's in your pocket. As I did that, I immediately grabbed that area. I actually grabbed both pockets just instantaneously and I could feel the [mass], a large [mass] that immediately I knew from my training and experience was the amount and probably the type of contraband that we were alerted to, in this particular case.

TFC Penny, whose testimony was found credible by the motions judge, never testified that he felt any part of Wilson's clothing prior to grabbing for the pockets of his jacket. His actions did not exceed the permissible scope of a *Terry* pat-down.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**