782 A.2d 387

STATE of Maryland

v.

Samuel Donovan FUNKHOUSER.

No. 0085, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Sept. 27, 2001.

700

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Frank Weathersbee, State's Atty. for Anne Arundel County, Annapolis, on the brief), for appellant.

Byron L. Warnken (Law Offices of Bonnie L. Warnken, on the brief), Baltimore, for appellee.

Submitted before ADKINS, CHARLES E. MOYLAN, Jr. (retired, specially assigned), and PAUL E. ALPERT (retired, specially assigned), JJ.

CHARLES E. MOYLAN, Jr., Judge (Retired, Specially Assigned)

This appeal, taken by the State from an adverse pre-trial suppression ruling, was noted on March 23, 2001. The record on appeal was filed in this Court on May 21. Briefs were filed and the case was submitted on brief for consideration by us on September 7. Under the time constraints of Courts and Judicial Proceedings Article, Sect. 12–302(c)(3)(iii), the decision of this Court was required to be filed no later than September 18. Accordingly, our decision, affirming the suppression ruling and assessing costs to the State, was filed on September 12. This opinion, explaining that decision, now follows.

\* \* \*

In the criminal appellate process, adversaries do not always meet on a level playing field. The question of who possesses

the advantage, however, is not a matter of status as State or as defendant. It is rather the *ad hoc* circumstance of which party, on a given occasion, enjoys the luxury of being the appellee and which suffers the burden of being the appellant. There is a strong presumption—a discernible "tilt" of the playing field—in favor of the status quo.

The appellee, Samuel Donovan Funkhouser, was charged by the Anne Arundel County Police Department with the possession of cocaine with the intent to distribute it. He moved, pretrial, to have the physical evidence suppressed on Fourth Amendment grounds. Following a hearing in the Circuit Court for Anne Arundel County, Judge Eugene M. Lerner granted the suppression motion. Pursuant to Courts and Judicial Proceedings Article, Sect. 12–302(c)(3), the State has filed the present appeal. We affirm Judge Lerner's ruling that the evidence will be suppressed.

### The Seizure and Subsequent Search: An Overview

On August 1, 2000, a white Jeep Wrangler, of which Funkhouser was the driver and sole occupant, was stopped by Detective Tom McBride, Jr. for an ostensible traffic violation. The traffic stop was ultimately followed by a warrantless search of the Jeep Wrangler for possible narcotics. After that search failed to produce either narcotics or other evidence, the police took from Funkhouser's person a pouch or "fanny pack" he had strapped around his waist and searched it. It contained a substance believed to be cocaine. As a result of that discovery, Funkhouser was arrested.

At the suppression hearing, Detective McBride and Detective Michael Barclay testified for the State. Funkhouser testified for the defense. At the conclusion of the hearing, Judge Lerner, without articulating any detailed findings of fact, made his ruling in essentially conclusory terms:

> I am going to grant his motion to suppress. I don't believe that [Detective Barclay] has a right to search that— to come and pull the—unbuckle that thing around his waist and just go in there and search that pouch, that pouch that he had on. I am going to grant the motion.

The twenty to twenty-five minute period of escalating investigative activity between the initial traffic stop and the ultimate search of the fanny pack analytically breaks out into three distinct stages: 1) the traffic stop; 2) the warrantless automobile search, including two proffered justifications and the question of its possible scope; and 3) what was, in effect, the search of Funkhouser's person.

If Portia's quality of mercy was twice blessed, the State's case on this appeal is thrice cursed. It is fatally flawed at each of the three analytic stages. Any one of the flaws would be sufficient to support Judge Lerner's ruling. Because an analysis of this roadside confrontation presents such a potentially instructive teaching vehicle, however, it behooves us to examine the flaw at each of the three stages.

### The Initial *Whren* Stop

Detectives McBride and Barclay were both narcotics officers, not traffic officers. On August 1, they had received a "tip" that a suspect driving a white Jeep Wrangler was in possession of a large quantity of cocaine at a gymnasium in a mall on Ritchie Highway. Their investigative purpose was to check out that "tip." With commendable candor, they freely acknowledged that they were taking advantage of the broad investigative prerogative available to them by virtue of *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). In *Charity v. State,* 132 Md.App. 598, 601, 753 A.2d 556 (2000), this Court described that broad prerogative:

> In *Whren* . . . the Supreme Court extended law enforcement officers a sweeping prerogative, permitting them to exploit the investigative opportunities presented to them by observing traffic infractions even when their primary, subjective intention is to look for narcotics violations.

The Fourth Amendment, *Whren* taught, is unconcerned with the actual subjective motivation or purpose of an officer who makes a traffic stop. The officer may be, as were Detectives McBride and Barclay here, concerned only with catching a narcotics dealer. To that end, they may wait opportunistically for a traffic violation to occur and then

pounce on that opportunity. What must never be forgotten, however, is that *Whren* establishes as an indispensable requirement that there be an actual, objectively measurable traffic violation. Absent an actual traffic infraction, the *Whren* scenario is never triggered.

What is unusual about this case is that the critical *Whren* issue is the objective occurrence of the triggering traffic infraction. Normally we are concerned with the scope or duration of an initially valid *Whren* stop.

## The Shifting Lenses of Appellate Review

Both Detective McBride and Detective Barclay testified that they saw Funkhouser in the Jeep Wrangler exit the mall at a red light and make a right-hand turn onto Ritchie Highway without first coming to a complete stop. On that basis, they overtook and then stopped the Jeep Wrangler. Funkhouser, by diametric contrast, testified that what the detectives said was untrue. He testified that, because of heavy traffic coming down Ritchie Highway, he was stopped "for a good two minutes" before he was able to turn onto Ritchie Highway. If that were, indeed, the case, the traffic stop was objectively bad and everything that followed from it was the tainted "fruit of the poisonous tree."

As we prepare to make our own independent constitutional appraisal of the second-level or conclusory issue of whether the traffic stop was objectively reasonable, we are faced with the familiar problem, but in an unusual posture, of which version of first-level facts from which to proceed. The detectives' version yields a good stop; Funkhouser's version yields a bad stop. The choice is that simple.

Had Judge Lerner made detailed findings of first-level facts, of course, it would be those findings we would accept, unless clearly erroneous. It was of this deference that we spoke in *Charity v. State,* 132 Md.App. at 606, 753 A.2d 556:

> The one obvious qualification to or modification of a reviewing court's acceptance of the version of the evidence most favorable to the prevailing party, of course, is with

respect to findings of first-level fact actually made by the hearing judge. Except in rare cases of clear error, we give great deference to such findings of fact when actually made. The actual findings of fact made by the hearing judge, unless clearly erroneous, "trump" the version most favorable to the prevailing party to the extent to which they might be in conflict. Again, Judge Karwacki [in *In re Tariq A–R–Y*, 347 Md. 484, 488–89, 701 A.2d 691 (1997)] explained:

> In considering the evidence presented at the suppression hearing, we extend great deference to the fact-finding of the suppression hearing judge with respect to determining the credibility of witnesses and to weighing and determining first-level facts. *Riddick [v. State]*, 319 Md. [180] at 183, 571 A.2d [1239] at 1240. When conflicting evidence is presented, we accept the facts as found by the hearing judge unless it is shown that those findings were clearly erroneous.

When we, as in this case, however, do not have express findings of fact by the hearing judge to which to defer, we are bound to take as true that version of the facts most favorable to the prevailing party. Again in the case of *In re Tariq A–R–Y*, 347 Md. at 488, 701 A.2d 691, Judge Karwacki explained:

> We are further limited to considering only that evidence and the inferences therefrom that are most favorable to the prevailing party on the motion, in this instance the State. *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990); *see also Simpler v. State*, 318 Md. 311, 312, 568 A.2d 22, 22 (1990).

*See also Wilkes v. State*, 364 Md. 554, 569, 774 A.2d 420 (2001) ("We review the facts found by the trial court in the light most favorable to the prevailing party.").

What is at least slightly unusual about this particular appellate review of a suppression ruling is the identification of the prevailing party. Of the suppression rulings that are appealed, nine times out of ten (if not 19 times out of 20) it is the State that is the prevailing party, with all the rights, honors and privileges thereto appertaining. In *Whren* situations, we

typically accept as controlling the testimony of the stopping officer that he, indeed, observed the traffic violation that justified the stop. To the chagrin of defense counsel, we typically reject utterly the testimony of the defendant as if it had never been given. A classic statement of which version of facts will be accepted was given in *Charity v. State,* 132 Md.App. at 606, 753 A.2d 556:

> At the suppression hearing in this case, for instance, the appellant himself testified, diametrically contrary to the testimony of Sergeant Lewis, 1) that he was not closely following any other automobile but was many car lengths behind the nearest vehicle and 2) that he was never asked to consent to a frisk of his person and never did consent. *For present purposes,* however, *we treat that testimony as if it had never been given. Our ruling will be based exclusively on the State's most favorable version of the events.*

(Emphasis supplied).

This is a valuable (nay, an indispensable) tool of appellate review, but it is a two-edged sword and those who are content frequently to live by that sword must also be prepared occasionally to die by that sword. The State, as more frequently than not the prevailing party, is routinely the beneficiary of that interpretative tilt but, as Macbeth once noted, occasionally "even-handed justice commends the ingredient of our poisoned chalice to our own lips." Sometimes the roles are reversed. When the roles are reversed, the results are frequently reversed.

In this case, of course, it is Funkhouser who is the prevailing party. It is, therefore, his version of the alleged traffic infraction that we will accept as our factual predicate for deciding the ultimate Fourth Amendment proprieties. To the extent that it is contradicted by Funkhouser, the testimony of Detectives McBride and Barclay will be utterly disregarded as if it had never been given.

Under that version of the facts most favorable to Funkhouser, the initial traffic stop was bad because there was no basis for it. Not only had Funkhouser come to a complete stop, he

remained stopped for approximately two minutes. It logically follows from that version of the facts that all of the sequelae of that unlawful stop were constitutionally tainted. The State does not even argue this issue of why we should accept a different version of the facts more favorable to it as the non-prevailing party, but glosses over the oft-expressed interpretive rule as if it did not exist. Judge Lerner was correct in suppressing the evidence.

In keeping with the theme we sounded at the very outset of the opinion, the lesson of this decision is that our resolution of the issue would have been a diametrically opposite one had the roles of appellant and appellee been reversed. The respective appellate postures of the parties, therefore, will frequently be controlling on such issues.

### The Warrantless Automobile Search

Even if, however, we were to assume, purely *arguendo,* that the traffic stop had been objectively reasonable, the warrantless search of the Jeep Wrangler that ensued shortly thereafter would still be fraught with crippling doctrinal problems. As a justification for the warrantless search, the State proffers but then drifts back and forth between two absolutely distinct theories.

### A. A Consensual Search of the Vehicle

■ On the one hand, the State argues that Funkhouser voluntarily consented to the search of his vehicle. The request for consent and the alleged giving of consent was unquestionably timely in terms of occurring while the processing of the ostensible traffic violation was still operational. In the very act of first approaching Funkhouser and requesting his driver's license and registration card, Detective McBride initiated the discussion with respect to consent to search the car. As Funkhouser was producing his license and registration, McBride told him that he was stopped for a traffic infraction involving the light at the parking lot.

McBride then asked Funkhouser "if he had any type of weapons, drugs, bombs, anything like that in the vehicle." Funkhouser replied "No." McBride then asked if Funkhouser would mind if McBride took a look inside Funkhouser's vehicle. Funkhouser questioned why McBride wanted to look in his vehicle. McBride told Funkhouser: "It's completely up to you whether I search your vehicle. Do you mind if I take a look?" Funkhouser replied: "No. Go ahead." The State's consent theory poses no problem in terms of its timeliness.

In another respect, however, the State's consent theory runs afoul of the same problem that ensnarled the State's attempt to establish the initial traffic infraction. The problem is that the version of the facts most favorable to the prevailing party is the one we must accept. Funkhouser, the prevailing party, testified that, when asked by Detective McBride if he minded whether the officer searched his vehicle, he replied, "Yes, I do mind." Accepting as we must that version of first-level fact, we necessarily conclude that Funkhouser did not consent to the search of his vehicle. That theory of justification does not get off the ground.

Again, however, the State blithely recites Detective McBride's testimony as if it were unquestioned historic fact and ignores the "trumping" reality that we look at the evidence through a very different lens on those occasions when the State happens not to be the prevailing party. The State seems to be in denial about being cast in the unaccustomed role of appellate underdog.

## B. A *Carroll* Doctrine Search of the Vehicle

Detective McBride testified that he immediately informed the other officers that Funkhouser had given his consent to the search of the vehicle. Neither detective explained why, if they thought they had valid consent for a search, they did not proceed immediately with the search at that point. Indeed, immediately after Detective McBride announced to his fellow officers that he had obtained consent to search the car, he ordered Funkhouser out of the vehicle. That was for the

express purpose of facilitating the search of the car's interior. That step was taken before the drug-sniffing dog had even been removed from the police cruiser. Under *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), on the other hand, the police would have needed no further justification beyond a valid traffic stop to have ordered Funkhouser out of the car. The consensual search that seemed imminent was inexplicably put "on hold."

Instead, Detective McBride testified that he returned to the police cruiser to make a radio check on Funkhouser's driving record and also to check for any outstanding warrants. After doing that, he brought out from his cruiser a trained and certified cocaine-sniffing canine and had the dog sniff the outside of the vehicle. The dog, after scanning the full circumference of the vehicle, made a positive alert at both the front driver's side door and the front passenger's side door. The search of the Jeep Wrangler did not begin until the canine "alert" was a *fait accompli.*

The officers were clearly trying to develop probable cause for a *Carroll* Doctrine search of the vehicle and that is the theory of justification that the State argues primarily. Consent, of course, has nothing to do with the *Carroll* Doctrine, and the intermittent references to consent do more to obscure than to clarify the State's position. Analysis is best in cleanly differentiated, watertight compartments.

## C. Did Probable Cause Accrue Before The *Whren* Traffic Stop Ceased To Be Operational?

The canine "alert," as will be discussed more fully, was potentially very strong evidence in the State's favor. A key question with respect to it, however, could be that of whether it was timely. As we probe for that precise borderline when the energizing force of the *Whren*-based traffic stop ran out and the ensuing narcotics investigation had to generate its own exclusive justification, we note that the canine "alert" on the vehicle came a number of minutes, possibly a critical number, after the timely request for consent to search the car. The State's consent theory, even if otherwise flawed, was at

least timely. The timeliness of the canine "alert," however, cannot "piggyback" on the timeliness of the request for consent. It demands a separate and distinct analysis.

Unlike both of the parties, who seem to be concentrating on the lapses of time between the initial stop and 1) the completion of the car search or 2) the search of Funkhouser's fanny pack, we think the critical passage of time was that between the initial stop and the first "alert" by the cocaine-sniffing dog. That "alert" was the moment when the criminal phase of the case took on a viable life of its own. Until that point, the reasonably diligent processing of the traffic violation had to be relied on to justify the detention.

In view of Detective McBride's acknowledgment that it normally would take him "about three or four minutes" to write a traffic ticket, the question of whether the reasonable processing of the traffic infraction stretched far enough to embrace and to legitimate the dog sniff of the Jeep Wrangler is problematic. McBride's testimony was that the canine "alert" came approximately five or six minutes after the initiation of the traffic stop.

By way of emphasizing the earlier lesson, let it be noted in this regard that if the State had been the prevailing party, a viewing of the evidence in the light most favorable to it would have rendered these extra few minutes now being discussed negligible and the State would almost certainly have prevailed on any challenge to the timeliness of the "alert." *See Wilkes v. State*, 364 Md. 554, 570–84, 774 A.2d 420 (2001) (In *Wilkes*, the State was the prevailing party). When viewing the same additional minutes in the light most favorable to Funkhouser, by contrast, the result will by no means necessarily be the same. This shifting in a reviewing court's perspective is akin to looking through opposite ends of a telescope. One way of looking at things magnifies; the other miniaturizes. It makes a critical difference, therefore, which side on a given occasion enjoys the advantage of having us view the critical confrontation through its end of the telescope.

Detective McBride, for instance, testified that he got back in his police car to radio in his request for a records check. If

that were true, it would clearly have justified some additional delay in processing the traffic stop. Funkhouser, on the other hand, testified that Detective McBride did not get back into the car or talk on the radio. The issue here, therefore, would be not how long it took to do a reasonable records check but whether, in fact, a records check was ever actually made. This is the quintessential type of factual ambiguity that would be resolved in the State's favor were it the prevailing party but in this case will be resolved in Funkhouser's favor because he is the prevailing party.

It would, of course, have been fatal to the State's case if the *Whren*-based justification for the detention had evaporated before the canine "alert" supervened. As Chief Judge Murphy explained for this Court in *Pryor v. State,* 122 Md.App. 671, 674–75, 716 A.2d 338 (1998):

> We hold that, unless continued detention can be justified by what occurs during the brief period of time it takes to determine whether the motorist has a valid license and whether the vehicle has been reported stolen, a motorist who is subjected to a *"Whren* stop" for a minor traffic violation cannot be detained at the scene of the stop longer than it takes—or reasonably should take—to issue a citation for the traffic violation that the motorist committed.

*See also Charity v. State,* 132 Md.App at 614–15, 753 A.2d 556; *Whitehead v. State,* 116 Md.App. 497, 503, 698 A.2d 1115 (1997); *Munafo v. State,* 105 Md.App. 662, 673, 660 A.2d 1068 (1995).

On this issue, however, we will again assume, purely *arguendo,* that the dog sniff, which pumped independent viability into the criminal investigation, was operational before the processing of the traffic stop had been totally drained of constitutional vitality.

## D. Probable Cause For A *Carroll* Doctrine Search

As to both the legitimacy of the canine investigation (if timely) and its probable-cause-generating significance, we fully agree with the State's arguments.

■ The smelling or sniffing of the exterior surface of an otherwise protected repository (automobile, suitcase, locker, etc.) is not a "search" within the contemplation of the Fourth Amendment. It, therefore, needed no justification. *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *cf. United States v. Jacobsen,* 466 U.S. 109, 124, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). *And see Wilkes v. State,* 364 Md. 554, 580–82, 774 A.2d 420 (2001). The only thing that needed justification was the detention of the Jeep Wrangler for enough time so that it would still be in place to be sniffed. *Gadson v. State,* 341 Md. 1, 20–21, 668 A.2d 22 (1995).

■ In this case there was no disputing the olfactory expertise of the trained and certified cocaine-sniffing canine. When a qualified dog signals to its handler that narcotics are in a vehicle, moreover, that is *ipso facto* probable cause to justify a warrantless *Carroll* Doctrine search of the vehicle. *Wilkes v. State,* 364 Md. at 586–87, 774 A.2d 420; *Gadson v. State,* 341 Md. at 8, 668 A.2d 22; *Timmons v. State,* 114 Md.App. 410, 417, 690 A.2d 530 (1997); *In Re Montrail M.,* 87 Md.App. 420, 437, 589 A.2d 1318 (1991); *Snow v. State,* 84 Md.App. 243, 248, 578 A.2d 816 (1990).

If, therefore, 1) we were to assume that the traffic stop had been objectively reasonable and 2) we were also to assume that the processing of the traffic violation was still in progress when the dog "alerted" to the car, the subsequent warrantless search of the vehicle was reasonable. In and of itself, however, that yields the State nothing. The Jeep Wrangler was searched twice. No narcotics were discovered.

## E. The Scope Of The *Carroll* Doctrine Search

■ When the searches of the Wrangler proved unproductive, the detectives turned their attention to Funkhouser himself, who was walking around, unrestrained, outside the vehicle. He was wearing a "fanny pack," buckled around his waist. Detective Barclay physically removed the "fanny pack" from Funkhouser's person. He unzipped it and searched it, finding what he believed to be cocaine. At the suppression

hearing, attention focused on the State's proffered justification for seizing the pack from Funkhouser's person and searching it. Judge Lerner inquired, "What right did they have to take [the] pouch?"

The only theory of justification advanced by the State was that Funkhouser, by virtue of his recent presence in the vehicle, was for *Carroll* Doctrine purposes a mere extension of the vehicle. The only exception to the warrant requirement argued, or even mentioned, by the State was the *Carroll* Doctrine, amplified by this arguable geographic expansion of its permissible search perimeter. The State argued that Funkhouser's "presence in that car seconds before the dog scanned is included in that probable cause, in that odor that the dog is alerting on." The State's line of argument was clear: "So, in this case **the Defendant is an extension of the car.**" (Emphasis supplied). The State seemed to be arguing that Funkhouser, albeit actually outside the car, was constructively still in the car: "Merely because he happened to be standing at the back of the car rather than in the car, [the detectives] get to search the Defendant because he is, you know, in the car."

Despite the creativity of the State's position, there is no case, state or federal, that has ever stretched the perimeter of a *Carroll* Doctrine search to embrace a former occupant of a vehicle who is at the moment of search already outside the vehicle. There has never been a *Carroll* Doctrine search of a person. The State conceded that it "did not have a case to cite" but argued that it was "asking this Court to take the common sense approach." Indeed, in its appellate brief the State argued to us:

Although none of the above cases specifically addressed whether the alert of a drug detection dog to the passenger compartment of a car establishes probable cause to search the *occupants* of the car, that is a logical conclusion. This is especially so given the circumstances of this case, where the dog gave a strong alert to the driver's seat area of the car. For the purpose of searching for drugs contained in that area of the car, *it would be unreasonable to distinguish*

*between the interior of the vehicle and the driver and sole occupant.*

(Emphasis in original and emphasis supplied). In terms of probable cause, there might be no reasonable distinction between a car and its driver. In terms of the degree of protection conferred by the Fourth Amendment, however, there is a very real distinction between an automobile and a human being.

The State's appeal to common sense is an argument eerily reminiscent of *United States v. Di Re,* 332 U.S. 581, 586, 68 S.Ct. 222, 92 L.Ed. 210 (1948), where the prosecution unsuccessfully urged on the Supreme Court precisely the proposition the State is now urging on us:

> Assuming, however, without deciding, that there was reasonable cause for searching the car, did it confer an incidental right to search Di Re? *It is admitted by the Government that there is no authority to that effect,* either in the statute or in precedent decision of this Court, *but we are asked to extend the assumed right of car search to include the person of occupants because "common sense demands that such right exist* in a case such as this where the contraband sought is a small article which could easily be concealed on the person."

(Emphasis supplied).

In *United States v. Di Re* it was assumed, *arguendo,* that there was probable cause to believe that contraband documents were in an automobile in which Di Re had been present as one of its three occupants. The government's claim was indistinguishable from the State's claim in this case:

> The claim is that officers have the right, without a warrant, to search any car which they have reasonable cause to believe carries contraband, *and incidentally may search any occupant of such car when the contraband sought is of a character that might be concealed on the person.*

332 U.S. at 584, 68 S.Ct. 222 (emphasis supplied). The Supreme Court refused to construe the *Carroll* Doctrine's

range of permissible searching as being intrusive enough to permit the search of occupants of the car:

> We see no ground for expanding the ruling in the *Carroll* case to justify this . . . search as incident to the search of a car. We are not convinced that a person, by mere presence in a suspected car, loses immunities from search of his person to which he would otherwise be entitled.

332 U.S. at 587, 68 S.Ct. 222.

The State might have argued, but did not, that stretching the *Carroll* Doctrine search perimeter to include a container that had shortly before been in the car is analytically distinct from stretching the search perimeter to include a person who had shortly before been in the car. It could have sought to analyze the "fanny pack" in a vacuum, as something distinct from and unconnected with the person wearing the "fanny pack." In *Wyoming v. Houghton*, 526 U.S. 295, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999), to be sure, the vulnerability to warrantless search of a container—in that case, a woman's purse—was deemed to be analytically distinct from the vulnerability to warrantless search of the person who was the owner of the container.

In terms of all of the critical criteria, however, *Wyoming v. Houghton* and this case are totally unlike each other. In *Wyoming v. Houghton* there was probable cause to search an automobile for contraband drugs. Sandra Houghton had been one of three occupants of the car and had been a passenger in the front seat. All three of the occupants were removed from the car before the *Carroll* Doctrine search of the car took place. Sandra Houghton's purse was sitting on the back seat when the car was searched. It was not attached to her body and was not being held by her in any way. It was searched just as the rest of the automobile was searched. It contained contraband drugs.

■ The holding of *Wyoming v. Houghton* is that a container 1) sitting on its own 2) in an automobile is just as vulnerable to a warrantless automobile search as any other part of the automobile in which the suspected evidence might be lurking.

The first requirement, clearly not satisfied in the case now before us, is that the container, in fact, be inside the automobile when the automobile is searched. "This case presents the question whether police officers violate the Fourth Amendment when they search a passenger's personal belongings **INSIDE AN AUTOMOBILE.**" 526 U.S. at 297, 119 S.Ct. 1297 (emphasis supplied). "[T]he Framers would have regarded as reasonable (if there was probable cause) the warrantless search of containers **WITHIN AN AUTOMOBILE.**" *Id.* at 300, 119 S.Ct. 1297 (emphasis supplied). "We hold that police officers with probable cause to search a car may inspect passengers' belongings **FOUND IN THE CAR** that are capable of concealing the object of the search." *Id.* at 307, 119 S.Ct. 1297 (emphasis supplied).

*See also California v. Acevedo,* 500 U.S. 565, 572, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) ("This Court in [*United States v.]* Ross*[,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572] took the critical step of saying that closed containers **IN CARS** could be searched without a warrant because of **THEIR PRESENCE WITHIN THE AUTOMOBILE.**" (Emphasis supplied)); *United States v. Johns,* 469 U.S. 478, 479–80, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985) ("*Ross* 'held that if police officers have probable cause to search a lawfully stopped vehicle, they may conduct a warrantless search of any container **FOUND INSIDE** that may conceal the object of the search.'") (emphasis supplied). *Wyoming v. Houghton,* 526 U.S. at 301, 119 S.Ct. 1297 characterized *Ross* as "applying broadly to all containers **WITHIN A CAR.**" (Emphasis supplied).

The "fanny pack" in this case was not inside the Jeep Wrangler during the *Carroll* Doctrine search of the Wrangler. Had it been and had it not been attached to the body of Funkhouser, it would unquestionably have been vulnerable to a warrantless search under *Wyoming v. Houghton* and *United States v. Ross.* Neither of those criteria, however, was satisfied.

It is the second of those two qualifying criteria that is implicit in Justice Scalia's majority opinion in *Wyoming v.*

*Houghton* but is fleshed out more articulately in the concurring opinion of Justice Breyer, who explained, 526 U.S. at 308, 119 S.Ct. 1297:

> Obviously, the rule applies only to automobile searches. Equally obviously, the rule applies only to containers found within automobiles. And it does not extend to the search of a person found in that automobile. As the Court notes, and as *United States v. Di Re,* makes clear, *the search of a person, including even "'a limited search of the outer clothing,'" is a very different matter in respect to which the law provides "significantly heightened protection."*

(Emphasis supplied).

Justice Breyer emphasized that because of the physical separation between the purse and the owner of the purse, the Fourth Amendment status of the purse under the circumstances of the case was that of a mere container and it could not be construed, as it might be in other circumstances, as constituting part of the outer clothing and, therefore, part of the person of the owner.

> Less obviously, but in my view also important, is the fact that the container here at issue, a woman's purse, was found at a considerable distance from its owner.... I can say that *it would matter if a woman's purse, like a man's billfold, were attached to her person. It might then amount to a kind of "outer clothing," Terry v. Ohio, supra,* [392 U.S. 1] at 24, [88 S.Ct. 1868, 20 L.Ed.2d 889] *which under the Court's cases would properly receive increased protection.* In this case, the purse was separate from the person....

526 U.S. at 308, 119 S.Ct. 1297 (emphasis supplied).

In this case, the "fanny pack," strapped around the waist of Funkhouser, was as much a part of Funkhouser's outer clothing as was the overcoat worn by John Terry in *Terry v. Ohio,* 392 U.S. 1, 24–25, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). It was as intimately a part of his person as would have been a money belt strapped around his waist, a wallet in his pocket, or a woman's purse actually being held in the hand of its owner. As Justice Scalia noted in the majority opinion:

And if the dissent thinks "pockets" and "clothing" do not count as part of the person, it must believe that the only searches of the person are strip searches.

526 U.S. at 303 n. 1, 119 S.Ct. 1297.

Under no stretch of the imagination could the warrantless seizure and subsequent search of the "fanny pack" be held to fall within the scope of a *Carroll* Doctrine search of the Jeep Wrangler or even to be an independent "container exception" search pursuant to whatever vitality may still remain in *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) or *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).

### Search Incident to Lawful Arrest

On appeal the State now advances an additional theory of Fourth Amendment justification that it had not advanced before Judge Lerner at the suppression hearing. It now claims that the same probable cause that justified the *Carroll* Doctrine search of the Jeep Wrangler was, *ipso facto,* probable cause to arrest Funkhouser and that the search of Funkhouser's person, including the "fanny pack," was a search incident to lawful arrest. It is an interesting theory, but there are impediments.

### A. The Preservation Problem

■■■ What could be, if not overlooked by us, a foreclosing impediment would be the State's failure to have preserved its argument on this issue for appellate review. Although most of the discussion in the case law of the preservation requirement is couched in terms of the obligation of a party objecting to the admissibility of evidence to state with specificity the grounds for the objection, by parity of reasoning the same obligation is on a party required to advance and argue grounds for admissibility. The general rule for preserving a particular argument for appellate review was well stated by Judge Harrell in *Anderson v. Litzenberg,* 115 Md.App. 549, 569, 694 A.2d 150 (1997):

A corollary to the aforementioned axiom addresses *the specificity of objections* raised at trial *concerning the* admission or *exclusion of evidence.* ... [C]ounsel may state with particularity the grounds for an objection, either voluntarily or at the trial judge's request. If counsel provides the trial judge with specific grounds for an objection, the litigant may raise on appeal only those grounds actually presented to the trial judge. *All other grounds for the objection, including those appearing for the first time in a party's appellate brief, are deemed waived.*

(Emphasis supplied).

In this case, it was Funkhouser who initially objected to the admission of physical evidence when he filed his pre-trial Motion to Suppress. Once he established, however, that the contraband in question had been taken from him in the course of a *warrantless* search and seizure, the obligation devolved upon the State to justify its departure from the warrant requirement. It was the State that had to satisfy Judge Lerner that the warrantless search was somehow justified. Judge Lerner, moreover, demanded specificity:

What right did they [the police] have to take [the] pouch?

The State advanced and argued the theory that there was probable cause for a *Carroll* Doctrine search of the Jeep Wrangler and that "the Defendant is an extension of the car." The exception to the warrant requirement for a search incident to lawful arrest was never mentioned, let alone argued. To couch this obligation in more routine procedural terms, it was the State that was objecting, on very specific grounds, to the exclusion of evidence.

The State, in effect, was objecting to the exclusion of evidence on the specific ground that its warrantless seizure was justified by the *Carroll* Doctrine. The words of Judge Orth in *State v. Kidd,* 281 Md. 32, 39, 375 A.2d 1105 (1977), are highly pertinent:

"On the other hand, where the trial court does request specific grounds for an objection, the objector is bound by the grounds he states, and he normally is deemed to have

waived any objection to the evidence on a ground not stated." This principle was extended by judicial decision, so that "where one objecting to the admission of evidence, although not requested by the court to state his grounds, goes ahead and delineates specific grounds for his objection he will be bound by those grounds and will ordinarily be deemed to have waived other grounds not mentioned."

In *Chertkof v. Dept. of Natural Resources*, 43 Md.App. 10, 16, 402 A.2d 1315 (1979), Judge Liss clearly related the preservation requirement to theories of argument:

> [E]ven if *Smith* were applicable, *the appellant would be precluded from raising a theory in this appeal upon which it now relies for the first time.* We have said innumerable times that except under unusual circumstances, we will abide by Maryland Rule 1085 which says, "This Court will not ordinarily decide any point or question which plainly does not appear by the record to have been tried and decided by the lower court." To permit appellant ... to raise an entirely new theory which was never espoused at any point ... would make a mockery of the appellate process. *A petitioner is bound to the theory he elects to pursue at trial.*

(Emphasis supplied). *See also Cooper v. State*, 128 Md.App. 257, 267, 737 A.2d 613 (1999); *Anthony v. State*, 117 Md.App. 119, 126, 699 A.2d 505 (1997); *Harmony v. State*, 88 Md.App. 306, 316–17, 594 A.2d 1182 (1991); *Dillsworth v. State*, 66 Md.App. 263, 268, 503 A.2d 734 (1986) ("As this theory was not advanced below, it is not preserved for our review.").

Because a judge may be right for the wrong reason and will therefore be affirmed, *Robinson v. State*, 17 Md.App. 451, 459, 302 A.2d 659 (1973), does not imply that a judge might be wrong for the wrong (or unspoken) reason and will therefore be reversed. One of the undergirding principles of the preservation requirement is that a trial judge will not be "sandbagged" by an issue that was not squarely raised. With rare exceptions not here pertinent, a judge will never be deemed to have been in error for having failed to consider *sua*

*sponte* a question or argument or theory not presented to him for consideration.

Judge Lerner was never called upon to make any decision with respect to a search incident to lawful arrest. It is with a certain ill grace that the State now argues that he was in error and should be reversed for having failed to raise *sua sponte* on the State's behalf and then to decide in the State's favor a Fourth Amendment issue that the State never asked him to decide.

Because in this case, however, we are desirous of expatiating on the subject of search incident to lawful arrest by way of considered *dicta*, we will not be constrained by the non-preservation of the issue. Indeed, as a motivation for sometimes overlooking the preservation requirement, we have noted that the "interpreting and molding of the law is as weighty a consideration in appellate councils as is the correction of error in individual cases." *Austin v. State*, 90 Md.App. 254, 271, 600 A.2d 1142 (1992). More important, although we may be commenting on a non-preserved issue, we most definitely are not deciding the case on the basis of a non-preserved issue.

### B. Probable Cause For A Warrantless Arrest

Given the *arguendo* assumptions we have already made, if there had been a warrantless arrest of Funkhouser in this case, we agree with the State that it would have been a lawful arrest. More precisely, we agree that the detectives on the scene had probable cause to believe that Funkhouser was in unlawful possession of contraband drugs.

The State recites the additional facts that after the initial canine "alert" on the exterior of the Jeep Wrangler, the canine, as part of the *Carroll* Doctrine search team, was invited to enter the vehicle. Once inside, the canine directed attention to the driver's seat as the epicenter of recent drug concentration. The other post-"alert" factor was that the *Carroll* Doctrine search revealed that the drugs, which probably had been in the car, were no longer there. Both of those

factors heightened the likelihood that the drugs were on Funkhouser. That heightened or incremental suspicion was, however, superfluous.

The probable cause developed by the initial canine "alert" was at one and the same time probable cause to believe both 1) that drugs were probably then in the car and 2) that its driver and sole occupant probably was then or recently had been in unlawful possession of those drugs.

The legal conclusions to which probable cause points are, albeit frequently related, slightly different in the cases of a warrantless automobile search and a warrantless arrest. One concerns a crime by a person; the other concerns evidence in a place. The factual predicate for those respective conclusions was, however, identical in this particular case.

In terms of quantifiable probability, moreover, the probable cause for a *Carroll* Doctrine search is the same as the probable cause for a warrantless arrest. Whatever the possible occurrence or circumstance, the likelihood of which we are assessing, probable cause itself is a constant. It does not take more probable cause to support a warrantless arrest than it does to support a warrantless automobile search. The classic *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), definition of probable cause is used for both conclusions alike, with no distinction made between the predicate for an automobile search and the predicate for a lawful arrest. Although the closely related predicates may sometimes differ slightly in terms of qualitative content or substance, they do not differ quantitatively in terms of degree of their probability. The measure of likelihood is the same.

In this case, the canine "alert" could have provided, all else being assumed to have been constitutional, a double justification for two related but separate and distinct Fourth Amendment events. The police not only had probable cause to search the Jeep Wrangler; they also had probable cause to arrest Funkhouser as its driver and lone occupant.

In *Ricks v. State*, 322 Md. 183, 586 A.2d 740 (1991), a positive "alert" by a trained canine was considered to be probable cause to arrest the possessor of the luggage.

> Ricks does not contest the intermediate appellate court's determination, which affirmed the trial court's denial of the motion to suppress, that his arrest was supported by the requisite probable cause. Indeed, *at oral argument before us, Ricks conceded that he was lawfully arrested, at least at the point when the dog scratched his bag, indicating that it contained narcotics.*

322 Md. at 188, 586 A.2d 740 (emphasis supplied).

*Florida v. Royer*, 460 U.S. 491, 506–07, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), expressly discussed both the legitimacy and the probable-cause-generating significance of a canine "alert":

> *The courts are not strangers to the use of trained dogs to detect the presence of controlled substances in luggage.* There is no indication here that this means was not feasible and available. If it had been used, Royer and his luggage could have been momentarily detained while this investigative procedure was carried out. Indeed, it may be that no detention at all would have been necessary. A negative result would have freed Royer in short order; *a positive result would have resulted in his justifiable arrest on probable cause.*

(Emphasis supplied).

In *Wilkes v. State*, 364 Md. 554, 774 A.2d 420 (2001), Judge Cathell, after holding that a canine "alert" had supplied probable cause to justify a warrantless automobile search, surmised that it might *ipso facto* support a warrantless arrest as well:

> Moreover, some jurisdictions have held that once a drug dog has alerted the trooper to the presence of illegal drugs in a vehicle, sufficient probable cause existed to support a warrantless arrest.

364 Md. at 587 n. 24, 774 A.2d 420.

He cited, with implicit approval, three cases from the federal circuit courts. *United States v. Klinginsmith*, 25 F.3d 1507, 1510 (10th Cir.1994), had no difficulty reaching this conclusion:

[W]hen the canine "alerted" to the vehicle, the district court held that the officers had probable cause to arrest the defendants and effect an immediate search under the automobile exception to the search warrant requirement.

We agree completely with the district court's analysis of this matter. . . . *[W]hen the dog "alerted," there was probable cause to arrest Magee and Klinginsmith.*

(Emphasis supplied). *United States v. Williams,* 726 F.2d 661, 663 (10th Cir.1984), reached the same conclusion:

Defendant's argument that probable cause for his arrest did not exist because the ticket agent lacked training in the drug courier profile fails because defendant ignores that *a drug sniffing dog's detection of contraband in luggage "itself establish[es] probable cause, enough for the arrest,* more than enough for the stop."

(Emphasis supplied).

The United States Court of Appeals for the Second Circuit held to the same effect in *United States v. Waltzer,* 682 F.2d 370 (2d Cir.1982). Waltzer was traveling from Fort Lauderdale, Florida, to New York City. A trained canine, "Kane," alerted on two pieces of luggage upon its arrival at Kennedy Airport. When Waltzer retrieved the luggage from the baggage carousel, he was immediately arrested. The Second Circuit held that probable cause had been shown to justify the warrantless arrest.

*We regard the dog's designation of the luggage as itself establishing probable cause,* enough for the arrest. . . .

Canine identification is a non-intrusive, discriminating and, in cases such as Kane, reliable method of identifying packages containing narcotics. . . . *Where designation by a dog with a record of accuracy occurs, therefore, we hold that probable cause has been established as to the person possessing the luggage.*

682 F.2d at 372–73 (emphasis supplied).

*United States v. Garcia,* 52 F.Supp.2d 1239 (D.Kan.1999), also lends strong support for our conclusion in this regard. On a rural Kansas highway two vehicles, traveling in apparent

convoy, were stopped for speeding violations. After a trained canine finally arrived at the scene and made a pertinent "alert" on both vehicles, the occupants of both vehicles were arrested. With respect to the constitutionality of the warrantless arrests, the court concluded:

> Even in the absence of the other information known by the troopers, *once the drug dog alerted on the two vehicles, the troopers had probable cause to arrest Garcia and the other occupants of the two vehicles.*

52 F.Supp.2d at 1253 (emphasis supplied).

## C. The Arrest As An Actuality, Not A Potentiality

■ Probable cause to make an arrest, however, is a far doctrinal cry from the arrest itself; the antecedent justification for an event is not the event itself. The Fourth Amendment significance of an arrest, as the trigger for a warrantless search incident, is not the accumulation of data in the mind of an officer; it is the change in the legal status of the person arrested. What matters is an actuality, not a potentiality. We need to remind ourselves periodically of the precise thing to which a "search incident" is incident. It is, of course, incident to a **lawful arrest.**

Of the firmly rooted exceptions to the warrant requirement, a search incident to lawful arrest is the only one that authorizes a full-blown search of a person for the purpose of discovering evidence. (The frisk component of a stop-and-frisk authorizes the pat-down of the clothing surface for the limited purpose of detecting the presence of a weapon.) Probable cause to believe that a person is carrying evidence does not justify a warrantless search of the person any more than probable cause to believe a home contains evidence justifies a warrantless search of a home. Only places or things enjoying a lesser expectation of privacy, such as automobiles, are vulnerable to probable-cause-based warrantless searches for the purpose of discovering and seizing evidence of crime.

■ That the police have probable cause for a lawful arrest of a person does not in and of itself justify a warrant-

less search of that person. The search must be incident to an arrest itself. It may not be incident merely to good cause to make an arrest. The existence of an unserved warrant of arrest, for instance, would not justify a warrantless search of a person who is not actually arrested. As this Court observed in *DiPasquale v. State,* 43 Md.App. 574, 577, 406 A.2d 665 (1979):

> *That the facts here might have established probable cause for an arrest of the appellant,* even before the baggie was seized, and for a good search incident thereto which would have produced the baggie *is beside the point. No arrest was made until after the seizure and the arrest was predicated on the observation of the thing seized.*

(Emphasis supplied). *And see Dixon v. State,* 23 Md.App. 19, 26, 327 A.2d 516 (1974) ("At the very threshold of search incident theory, the search must be incident not merely to an arrest but to a lawful arrest.").

As early as *Weeks v. United States,* 232 U.S. 383, 392, 34 S.Ct. 341, 58 L.Ed. 652 (1914), the Supreme Court confirmed the right of the police, "always recognized under English and American law, to search the person of the accused *when legally arrested* to discovery and seize the fruits or evidences of crime." (Emphasis supplied). *And see Agnello v. United States,* 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145 (1925) ("... the right ... to search *persons lawfully arrested* ....") (Emphasis supplied). A seminal "search incident" opinion was *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), which explained the twin reasons for the warrantless search prerogative once a suspect has been placed under arrest:

> "*When an arrest is made,* it is reasonable for the arresting officer to *search the person arrested* in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and *the arrest itself frustrated.* In addition, it is entirely reasonable for the arresting officer

to search for and seize any *evidence on the arrestee's person* in order to prevent its concealment or destruction."

(Emphasis supplied).

*Terry v. Ohio,* 392 U.S. 1, 25–26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) elaborated on the difference between a mere detention of a person, which would at most give rise to a right to "frisk" for suspected weapons, and a formal arrest, which gives rise to the right to make a full-blown search as an incident of that arrest.

"... *An arrest is a wholly different kind of intrusion* upon individual freedom from a limited search for weapons, and the interests each is designed to serve are likewise quite different. *An arrest is the initial stage of a criminal prosecution.* It is intended to vindicate society's interest in having its laws obeyed, and *it is inevitably accompanied by future interference with the individual's freedom of movement,* whether or not trial or conviction ultimately follows...."

(Emphasis supplied).

A key opinion regularly looked to by the Supreme Court as authority on "search incident" law was that of the Court of Appeals of New York in *People v. Chiagles,* 237 N.Y. 193, 197, 142 N.E. 583, 584 (1923), in which then Judge Benjamin Cardozo explained that the police prerogative of making a warrantless search incident arises when "the law is in the act of subjecting the body of the accused to its physical dominion."

*United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) repeatedly referred to the necessary predicate for a warrantless search incident as being not only an actual arrest but as, moreover, "a lawful custodial arrest." 414 U.S. at 234, 235, 236, 94 S.Ct. 467. The opinion referred to the increased danger emanating from the formal arresting of a suspect.

It is scarcely open to doubt that *the danger to an officer is far greater in the case of the extended exposure which follows the taking of a suspect into custody* and transporting him to the police station than in the case of the

relatively fleeting contact resulting from the typical *Terry*-type stop. *This is an adequate basis for treating all custodial arrests alike for purposes of search justification.*
414 U.S. at 234–35, 94 S.Ct. 467 (emphasis supplied).

*United States v. Robinson* explained that it is the placing of a person under arrest itself that is the significant Fourth Amendment intrusion and the ensuing search incident is merely an attendant consequence of that intrusion.

A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. *It is the fact of the lawful arrest which establishes the authority to search,* and we hold that *in the case of a lawful custodial arrest a full search of the person* is not only an exception to the warrant requirement of the Fourth Amendment, but *is also a "reasonable" search* under that Amendment.
414 U.S. at 235, 94 S.Ct. 467 (emphasis supplied).

The State is taking exactly the same position before us as that taken by the State of Iowa before the Supreme Court in *Knowles v. Iowa,* 525 U.S. 113, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998). The Iowa police had both probable cause and lawful authority to make a custodial arrest of Knowles for a speeding violation. Although armed with full justification to arrest Knowles, the police did not arrest him. Instead, they followed "the far more usual practice of issuing a citation in lieu of arrest or in lieu of continued custody after an initial arrest." 525 U.S. at 115, 119 S.Ct. 484. Iowa statutory law, however, authorized the officers "to conduct a full-blown search of an automobile and driver in those cases where police elect not to make a custodial arrest and instead issue a citation—that is, a search incident to citation." *Id.* They made such a search and found narcotics.

Knowles's position there was akin to what would be Funkhouser's back-up position here:

Knowles moved to suppress the evidence so obtained. *He argued that the search could not be sustained under the*

*"search incident to arrest" exception* recognized in *United States v. Robinson, because he had not been placed under arrest.*

525 U.S. at 114, 119 S.Ct. 484 (emphasis supplied).

The Supreme Court of Iowa took the position urged by the State before us. 569 N.W.2d 601 (1997). It affirmed the legitimacy of the warrantless search, "reasoning that so long as the arresting officer had probable cause to make a custodial arrest, there need not in fact have been a custodial arrest." 525 U.S. at 115–16, 119 S.Ct. 484. The Supreme Court of the United States reversed the Iowa decision. It "noted the two historical rationales for the 'search incident to arrest' exception," 525 U.S. at 116, 119 S.Ct. 484, and then, quoting *United States v. Robinson,* held that "the danger to the police officer flows from the fact of the arrest, and its attendant proximity, stress, and uncertainty, and not from the grounds for arrest." 525 U.S. at 117, 119 S.Ct. 484. Only a custodial arrest will support a warrantless search incident.

It is axiomatic that a search incident to lawful arrest is absolutely dependent on the fact of an actual arrest. In this regard, we noted in *Evans v. State,* 113 Md.App. 347, 349–50, 688 A.2d 28 (1997), *rev'd on other grounds by State v. Evans,* 352 Md. 496, 723 A.2d 423 (1999):

Our first concern will be with the constitutional requirements of a search incident to lawful arrest. With respect to that exception, most of the case law has been concerned with the permitted scope, both extensive and intensive, of a search incident. Our concern in this case, however, is with the more neglected question of what is the required predicate to initiate a warrantless search incident in the first instance, regardless of what its ultimate scope may be. *The simple answer inheres in the very name of the exception itself. There is no such constitutional entity as a reasonable search incident to an unlawful arrest. There is no constitutional entity as a reasonable search incident to a*

*non-arrest. There is only a "search incident to a (1) lawful (2) arrest."*

(Emphasis supplied).

In the *Evans* case, the Court of Appeals reversed the Court of Special Appeals, but did so only on the issue of whether an undergirding arrest had actually been made. The Court of Special Appeals had held that no undergirding arrest had actually been made. The Court of Appeals reversed, holding that an undergirding arrest had, indeed, been made. Both courts were in agreement, however, that there can be no search incident without an undergirding arrest. Judge Raker's opinion, 352 Md. at 512, 723 A.2d 423, made it clear that the issue before the Court in *Evans* was whether, under Maryland law, arrests had actually been made:

> The threshold issue in these cases, however, is not whether the police had the legal authority to arrest Evans and Sykes–Bey but whether the initial detentions of Respondents constituted arrests under Maryland law.

The Court of Appeals concluded, 352 Md. at 515, 723 A.2d 423, that actual arrests had, indeed, been made:

> It is thus beyond question that the initial detentions of Respondents rose to the level of a physical restraint or a subjugation to police custody and control. We therefore conclude that the initial detentions of Respondents by the police constituted arrests.

Judge Raker's opinion left no doubt that an actual arrest is an indispensable prerequisite for a warrantless search incident to lawful arrest:

> It might thus be stated that *the sole prerequisite for application of "the search incident to lawful arrest" exception is the existence of a lawful arrest.* The Supreme Court itself has articulated no greater a standard: *"The fact of a lawful arrest, standing alone, authorizes a search."*

352 Md. at 518, 723 A.2d 423 (emphasis supplied). The Court of Appeals concluded, 352 Md. at 519, 723 A.2d 423:

*[O]ur earlier holding that the initial detentions of Respondents constituted lawful arrests* under Maryland law *should be dispositive of the search incident issue:* given the existence of a valid arrest, the officers were constitutionally permitted under *Robinson* and its progeny, as well as our own precedent, to conduct full searches of Evans and Sykes–Bey.

(Emphasis supplied).

Speaking through Chief Judge Murphy, the Court of Appeals had earlier squarely held in *Bouldin v. State,* 276 Md. 511, 515–16, 350 A.2d 130 (1976), that it is the arrest, not the right to arrest, that justifies a warrantless search incident.

Of course, the right to arrest is not equivalent to making an arrest; *the record must satisfactorily demonstrate that an arrest was in fact consummated before a warrantless search incident thereto may be found to be lawful.*

(Emphasis supplied).

### D. The Difference Between "Incidental" and "Essentially Contemporaneous"

For a search to be an incident of an arrest, it need not literally follow the arrest. If an officer has determined to make an arrest, the search incident is simply an aspect of the arresting prerogative. It is one part of an omnibus tactical maneuver. Because of the potential exigencies of a police-citizen confrontation, the process of 1) disarming the arrestee and 2) preempting destructible evidence a) may proceed simultaneously with the act of arresting or b) may even precede it by a moment or two. This departure from more routine sequencing does not destroy the search's character as an aspect or incident of the arrest it merely supports and accompanies.

The temporal latitude that we extend to incidental searches that are "essentially contemporaneous," however, does not dictate embracing antecedent searches that, albeit essentially contemporaneous, are nonetheless not incidental. An arrest that is made on the basis of what the search

recovers will never be constitutional no matter how instantaneously it may follow the search. As *Sibron v. New York,* 392 U.S. 40, 63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) clearly stated, "It is axiomatic that an incident search may not precede an arrest and serve as part of its justification." We explained this in *Anderson v. State,* 78 Md.App. 471, 480–81, 553 A.2d 1296 (1989):

> At the most fundamental level, the exception, by its very name as well as by its *Raison d'etre,* is *"search incident to arrest"* and not *"arrest incident to search."* Although the precise sequence between the incidental search and the arrest is not of critical importance, the cause-and-effect relationship is.

The State seeks to avoid the foreclosing effect of no arrest having been made by arguing that the arrest followed the search almost immediately thereafter and was, therefore, "essentially contemporaneous" as if that tight sequencing were dispositive. In this case it is clear, however, that no decision to arrest Funkhouser had been made and that the seizure and search of the "fanny pack" was no mere incident of an arrest already in motion, even if moments behind, on a parallel track. It was, rather, the finding of suspected drugs in the "fanny pack" that was the precipitating or catalytic agent for Funkhouser's arrest in this case. There is no suggestion that Funkhouser was going to be arrested regardless of what the search of the "fanny pack" revealed. This was an arrest incident to search.

This case is far more akin to the ostensible search incident to arrest which the Supreme Court struck down in *Smith v. Ohio,* 494 U.S. 541, 110 S.Ct. 1288, 108 L.Ed.2d 464 (1990). The police there grabbed and searched a brown paper grocery bag which Smith had been carrying very "gingerly" and then attempted to shield from the police. When they discovered drug paraphernalia in the bag, they immediately arrested Smith. The Supreme Court of Ohio ruled that the search was a constitutional search incident to lawful arrest. Notwithstanding the closeness in time between the search and the

arrest, the search was not an incident of the arrest. The Supreme Court held:

> That reasoning, however, "justify[ing] the arrest by the search and at the same time . . . the search by the arrest," just "will not do." As we have had occasion in the past to observe, "[i]t is axiomatic that an incident search may not precede an arrest and serve as part of its justification." The exception for searches incident to arrest permits the police to search a lawfully arrested person and areas within his immediate control. Contrary to the Ohio Supreme Court's reasoning, it does not permit the police to search any citizen without a warrant or probable cause so long as an arrest immediately follows.

494 U.S. at 543, 110 S.Ct. 1288.

■ Essential contemporaneity is a necessary condition for an out-of-sequence search incident, but it is not a sufficient condition. "Essentially contemporaneous" is not, in and of itself, a legitimating mantra.

Cases such as *Rawlings v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), and *Lee v. State,* 311 Md. 642, 537 A.2d 235 (1988), were cases in which the closely related acts of arresting and searching were proceeding simultaneously. In *Anderson v. State,* 78 Md.App. at 481, 553 A.2d 1296, we fully explained the significance of being "essentially contemporaneous" as the qualifier for a departure from the ordinary time sequence.

> *[T]here is no rigid requirement that the arrest literally precede its search incident. It is enough that they are essentially contemporaneous.* The exigencies that give rise to the search incident exception in the first place—the risk of harm to the arresting officer and the risk of destruction of readily accessible evidence—sometimes compel a departure from the formal protocol. There will be occasions when the arresting officer deems it tactically unwise to lose critical seconds or even to be momentarily distracted from his overriding necessity of "beating his opponent to the draw." Under the circumstances, it would exalt form over

substance to the point of absurdity to insist that an officer clap his hand upon an arrestee's shoulder and say the operative words, "You are under arrest," before disarming and/or neutralizing a potentially dangerous target. *The paradigm might yield a dead officer. It is enough, therefore, that the search closely anticipate, contemporaneously parallel, or follow shortly after the arrest of which it is an incident.* In all three time frames, it is still an incident of the arrest. *This is the purpose of the practical requirement that a lawful arrest and its search incident need only be essentially contemporaneous.*

(Emphasis supplied).

The temporal proximity between the search and the arrest, however, does not qualify the search as an "incident" of the arrest. That is a separate consideration. The seizing and searching of the "fanny pack" in this case was not a consequence or incident of a decision to arrest Funkhouser. The arrest of Funkhouser, rather, was a consequence of what was found in the search of the "fanny pack," notwithstanding the fact that the detectives may have had an alternative and independent basis for arresting him. They were not acting on such a basis. What was flawed was not the proximity in time between the search and the arrest, but the lack of a proper cause-and-effect relationship. It was of this causative link that we spoke in *Anderson v. State.*

The exigencies of the essentially combat situation that exempt the policeman from the formal rigidities of parade-ground sequencing do not exempt him, however, from establishing the indispensable cause-and-effect relationship between the predicate event and its incidents.... The search incident may not "bootstrap" itself by using its results to provide its own justification. No search may justify itself on the basis of what it finds.... Thus, *although the attendant search need not technically be "subsequent to," it must still be "incident to" its predicate lawful arrest.*

78 Md.App. at 481–82, 553 A.2d 1296 (emphasis supplied).

The shortness of the time period within which the arrest followed the search in this case could not transform the arrest

into the cause of the search.  The search had its own independent causation.  The search was not an incident of the arrest.

## CONCLUSION

The pre-trial decision of Judge Lerner to suppress the physical evidence was correct.  The search that produced the physical evidence was constitutionally flawed in at least three separate ways.

The initial traffic stop (the first seizure of Funkhouser's person) was unlawful, thereby tainting everything that followed.  Even assuming that were not the case, the warrantless search of the "fanny pack" worn by Funkhouser could not be justified as a *Carroll* Doctrine search under the notion that Funkhouser, having been recently in the car, was thereby a searchable extension of the car.  The State's alternative theory, even if timely raised, that the search of the "fanny pack" was an incident of Funkhouser's lawful arrest is also not viable.  There was no antecedent arrest or, indeed, any arrest of which the search in this case was a mere incident.  It was for these reasons that we earlier affirmed the ruling of Judge Lerner to suppress the evidence.